# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**ROBERT KARL GEORGE,**

       Plaintiff,

v.                                         Case No. 3:10-cv-688-J-34JBT

**WALTER McNEIL,**
et al.,

       Defendants.

_____/

## RENEWED MOTION FOR SUMMARY JUDGMENT

Defendants renew their motion for summary judgment, pursuant to Fed.R.Civ.P. 56.

The court should grant judgment for Dr. Le because he did not act with deliberate indifference to the plaintiff's medical needs.

The court should grant judgment for Dr. Solorzano because his decision to adhere to the Department of Corrections' protocol for treatment of hepatitis C was based on medical reasons consistent with the community standard of care.

The court should grant judgment for McNeil, Robinson, Kemp and Flores because the plaintiff's case against them is based only on allegations that these defendants denied the plaintiff's grievances. A claim based merely on the denial of an inmate's grievance does not support an Eighth Amendment claim.

The court should grant judgment for Dr. Ogunsanwo because he was not involved in any decisions concerning the plaintiff's medical treatment.

1

Finally, the defendants are entitled to qualified immunity.

The plaintiff may suggest that the court should defer ruling on this motion -- deny it altogether -- until it has decided whether he can use two medical experts designated as witnesses on the last day of discovery. See DE 104. However, that dispute should not delay a ruling especially as to the defendants whose only alleged bad acts involved the handling of the plaintiff's grievances. Expert medical testimony will not assist the court in determining the liability of those defendants. Nor is it relevant to the claims against Dr. Le, the plaintiff's primary care physician. The undisputed evidence shows that Dr. Le did everything within his power to properly treat the plaintiff.

## STATEMENT OF FACTS

This case primarily concerns a former prison inmate's claim that he was refused treatment for a hepatitis C infection while in prison by prison administrators and medical personnel based on a department protocol that withheld the standard drug regime if the inmate was within 18 months of release.

Mr. George today cannot remember when he contracted hepatitis C. The best he can recall, that occurred sometime during the 1990s. Plaintiff's deposition (exhibit 2) p. 17-18. DOC medical records indicate that he contracted the disease in 1994. Expert's report (exhibit 1) p. 1.

Hepatitis C is a leading cause of chronic liver disease. The disease is usually asymptomatic for many years, perhaps decades, and many patients never develop symptoms. A percentage will develop symptoms, which include abdominal pain and bloating, nausea, fatigue and, among other things, peripheral edema as a result of cirrhosis of the liver. Only about 10-20 percent of patients with chronic hepatitis C progress to cirrhosis over an average of 20 years. Expert's report (exhibit 1) p. 1.

Before his incarceration, Mr. George did not seek treatment. Plaintiff's deposition (exhibit 2) p. 21-25.

Mr. George entered DOC custody in June 2009. Plaintiff's deposition (exhibit 2) p. 28.  He was tested for hepatitis C on June 16, 2009. Exhibit 3 p. 1. The test came back positive. Exhibit 3 p.1.

He went to Santa Rosa Correctional Institution in July 2009 and then about three weeks later, was transferred to Baker Correctional Institution, arriving in August 2009. Plaintiff's deposition (exhibit 2) p. 28.

Mr. George met Dr. Le at Baker CI. Plaintiff's deposition (exhibit 2) p. 29. Dr. Le authorized laboratory tests to determine Mr. George's 'viral load' as a result of his hepatitis C infection. Le declaration (exhibit 4) p. 1. That test was performed in September 2009. *Id.*, and exhibit 3 p 4.

In November, after that test, Dr. Le ordered a second test to determine the genotype of the infection because the responsiveness to treatment of a given hepatitis infection depends on the genotype; some are more responsive than others. Le declaration (exhibit 4) p. 1; Plaintiff's deposition (exhibit 2) p. 30. There are, in fact, six main genotypes of hepatitis C, with genotypes 2 and 3 being the most amendable to therapy. Expert's report (exhibit 1) p. 1. The plaintiff's medical records indicate that he has genotype 1, which is more difficult to treat. Expert's report (exhibit 1) p. 1; exhibit 3 p. 2.

Also in November 2009, Dr. Le requested that a sonogram be performed by Dr. Radi, a specialist, and it was done on November 25, 2009. Le declaration (exhibit 4) p. 1; Plaintiff's deposition (exhibit 2) p. 31-32.

Dr. Le then arranged for Mr. George to be seen a second time by Dr. Radi in January 2010. Le declaration (exhibit 4) p. 1. Dr. Radi recommended that a liver

biopsy be performed. Le declaration (exhibit 4) p. 1; Plaintiff's deposition (exhibit 2) p. 33.

Based on Dr. Radi's recommendation, Dr. Le requested a liver biopsy. Le declaration (exhibit 4) p. 1; Plaintiff's deposition (exhibit 2) pp. 33-34.

Dr. Solorzano, in DOC's utilization management unit, denied the request by letter dated January 29, 2010, based on Health Services Bulletin 15.03.09/Supplement 10/2/08 on the ground that the inmate's projected release date would occur in less than 18 months. Le declaration (exhibit 4) p. 1; Solorzano declaration (exhibit 5) p. 1. At that time, the plaintiff's release date was May 29, 2011. Haynes affidavit (exhibit 6).

The Health Services Bulletin states:

> c.     The treatment for hepatitis C is potentially hazardous and the presence of possible contraindications must be evaluated before undertaking treatment.  . . .

> d.     The treatment of hepatitis C with current therapy is often unsuccessful.  Interruption of treatment not only dramatically lessens the chance of success, it may also lead to the development of a virus that is resistant to medication, compromising future attempts at treatment.  Currently, county health departments in Florida do not provide medication to treat hepatitis C so inmates may be unable to obtain continued medication after release.  Therefore, inmates must have enough time remaining on their sentence to allow for the completion of treatment while incarcerated.

> e.     Furthermore, ribavirin, a portion of the current treatment protocol, has the potential to cause birth defects. This can occur not only during treatment, but for a period of up to six (6) months following the completion of treatment.  Because the department cannot provide the pharmaceutical manufacturer's mandated counseling to sexual partners of inmate patients being treated with ribavirin, a provision must be made for a six (6) month period of observation within the department after the end of treatment.

4

Solorzano declaration (exhibit 5) p. 1; exhibit 7 HSB15.03.09/supplement # 10/02/08 p. 2.

Dr. Solorzano states, "Treatment with ribavirin/interferon, the recommended therapy for hepatitis C, genotype 1, takes about 48 weeks. Consequently, the department requires that an inmate have at least 18 months remaining on his or her sentence before beginning such treatment because the treatment cannot be safely administered in less than 18 months." Solorzano declaration (exhibit 5) p. 1.

Therefore, he states, "I made this recommendation for medical reasons and reasonably relied on the DOC hepatitis treatment protocol, which reflects the community standard for treating hepatitis C." Solorzano declaration (exhibit 5) p. 2.

The plaintiff's expert, Dr. Rahangdale, further explains the medical basis for the protocol:

> Standard of care treatment of hepatitis C virus is with Pegylated Interferon and Ribavirin, and may be for 48 weeks in patients with genotype 1 infection. This treatment is associated with many side effects, which in some cases can be serious or even fatal and ultimately interfere with treatment outcome. For these reasons, most scientific societies do not currently recommend a broad treatment approach, advocating instead a patient selection process where a multitude of baseline factors are considered as clinical drivers. The first drug of the two drug regimen utilize to treat hepatitis C is pegylated interferon, and it can cause fatal or life-threatening complications such as infections, ischemia, autoimmune reactions, and neuropsychiatric emergencies. In some cases, complications may not resolve even when medications are withdrawn, and post-treatment medication-related side effect management requires patient care continuity for a period of weeks after therapy is completed. Ribavirin, the second component of treatment of hepatitis C, causes birth defects, fetal demise, severe anemia, cardiac disease progression, and is potentially carcinogenic. As such, the U.S. Food and Drug Administration has assigned ribavirin a pregnancy X risk category (positive evidence of fetal risk in humans outweighs ANY possible benefit). This birth defect risk, known as teratogenicity, has been

5

shown at doses that are one hundredth of those prescribed for hepatitis C treatment. As a result, it is recommended that women of childbearing potential and men should use two forms of contraception for six full months after treatment has concluded (as well as during treatment of hepatitis C with ribavirin). This is why the Florida Department of Corrections Technical Instrument 15.03.09 stipulates that a provision must be made for a six (6) month period of observation within the department after the end of treatment, which may be a minimum of 48 weeks (11 months), in a patient with chronic hepatitis C genotype 1 viral infection. As full initial treatment of eligible genotype 1 hepatitis C patients follows an algorithm that can require 48 weeks of therapy, followed by post-treatment monitoring of at least six (6) months, a period of approximately 18 months of incarceration is appropriate for patients receiving hepatitis C infection to receive adequate care, monitoring for side effects, and prevention of ribavirin-related toxicity form seminal fluids spread through sexual activity.

Expert's report (exhibit 1) pp. 1-2.

Dr. Rahangdale states that a liver biopsy is necessary to determine whether to begin ribavirin/interferon treatment. Expert's report (exhibit 1) p. 2. Even with this drug regime, 50 percent of hepatitis C patients are not cured. *Id.*

He further states, "I believe that the treatment protocol of requiring 18 months of incarceration to be eligible for therapy is safe and prudent. To be consistent with community standards of care when using such potentially toxic treatments, it is advisable that the Florida Department of Corrections retain such a time frame when making decisions whether to pursue treatment of hepatitis C for potentially eligible inmates. It should be noted that the department does not have the statutory ability to provide counseling or monitoring post release to the former inmate or their future sexual partners, and thus cannot guarantee that ribavirin toxicity will not be spread to others in the community after an inmate's release from prison.

Again, that is why a six month period of incarceration after treatment with ribavirin is ethically mandatory." Expert's report (exhibit 1) p. 3.

After the denial of the biopsy, Dr. Le contacted both the chief administrator of utilization management, at that time Donna Graham, and Lonnie Strickland, who was then the Region II health services administrator, several times to request again that the biopsy be done. Le declaration (exhibit 4) p. 1; Plaintiff's deposition (exhibit 2) p. 35, where he admitted: "I know Dr. Le recommended treatment again. He actually emailed three or four different people saying: Hey, this man does need to be treated."

However, Dr. Le's additional efforts to obtain a liver biopsy for Mr. George were not successful. Le declaration (exhibit 4) p. 1.

Meanwhile, Dr. Le continued to follow Mr. George for hepatitis C by periodically monitoring his liver function through the use of blood tests of his liver enzyme levels (tests were conducted in September 2009, February 2010, August 2010 and February 2011) , and through periodic physical examinations. Dr. Le noted no indication of liver disease or any complications of hepatitis C, in that he detected no indication of profound fatigue, abdominal bloating and discomfort, swelling of the legs, feet and belly, easy bruising and muscle weakness, which are associated with active hepatitis C infection. Le declaration (exhibit 4) p. 2; expert's report (exhibit 1) p. 4.

Dr. Le had no ability himself either to conduct a liver biopsy or to provide ribavirin/interferon treatment. Le declaration (exhibit 4) p. 2; Plaintiff's deposition (exhibit 2) pp. 36-37.

Mr. George contends that Dr. Ogunsanwo participated in the decision to deny him a biopsy or further treatment for hepatitis C. He believes, but does not

know for sure, that Dr. Le contacted Dr. Ogunsanwo in his further efforts to obtain approval of a biopsy. Plaintiff's deposition (exhibit 2) p. 49.

However, Dr. Ogunsanwo played no part in the decision. He was medical executive director for DOC region III from May 19, 2006, to April 18, 2010. Ogunsanswo declaration (exhibit 8) p. 1.  (At the time, the department was organized into four regions for administrative purposes.[1] Today, there are three regions.[2]) Baker CI was in Region II and therefore outside Dr. Ogunsanwo's area of responsibility. *Id*. Dr. Ogunsanwo states: "I was not involved in treatment decisions involving inmates in Region II institutions, nor was I usually consulted about such treatment decisions. No one contacted me about any treatment decisions affecting Robert George, the plaintiff in this lawsuit, nor was I involved in responding to any medical care grievances Mr. George may have submitted. I have no personal knowledge about Mr. George. It is my understanding that he was at Baker CI for most of his incarceration." *Id*.

Despite the fact that Dr. Le went to extraordinary lengths to help him, Mr. George sues the doctor because he believes that Dr. Le acted wrongfully by signing responses to grievances saying that the plaintiff was being treated for hepatitis C. Plaintiff's deposition (exhibit 2) p. 38.

Indeed, Mr. George sues the remaining defendants—Mr. McNeil, Ms. Flores, Ms. Robinson, and Ms. Kemp—because of his belief they were involved in responding to his grievances about his hepatitis C treatment.

Concerning Mr. **McNeil**, at the time the secretary of the department, the plaintiff claims:

---

[1] The DOC annual report for 2010-2011 shows four regions. http://www.dc.state.fl.us/pub/annual/1011/ar-prisons.html#InstitutionsMap

[2] See http://www.dc.state.fl.us/orginfo/orgchart.html.

- on Feb. 12, 2010, he filed a "request for administrative remedy or appeal" with Mr. McNeil, who instructed the plaintiff to file it at the institutional level (Mr. McNeil is the secretary of the Department of Corrections). Fourth amended complaint p. 6.

- on March 15, 2010, the plaintiff filed another "request for administrative remedy or appeal" with Mr. McNeil. On March 26, he received a reply, but it was not signed by Mr. McNeil, but by Defendants Robinson and Le. Fourth amended complaint p. 7.

- on March 26, 2010, the plaintiff filed yet another "request for administrative remedy or appeal" with Mr. McNeil. The defendant denied the grievance on May 26, 2010. Fourth amended complaint p. 7.

The plaintiff contends that Mr. McNeil is liable solely because he was the department secretary and authorized Ms. Kemp to respond to the plaintiff's grievances on his behalf. Plaintiff's deposition (exhibit 2) p. 40

Concerning Ms. **Flores,** the warden of Baker CI at the time he was there, the plaintiff claims:

- on March 10, 2010, the plaintiff filed a "request for administrative remedy or appeal" with Defendant Flores. Fourth amended complaint p. 7.  He does not allege that Defendant Flores took any action on the request.

The plaintiff believes that Ms. Flores is liable because she was warden at the prison, and because she shifted responsibility for responding to his grievances onto Ms. Robinson. Plaintiff's deposition (exhibit 2) p. 56-57.

Concerning Ms. **Robinson**, an assistant warden at Baker CI, the plaintiff claims:

- on Feb. 23 and March 2, 2010, the plaintiff filed requests for administrative remedy requesting medical care, but the defendant denied

9

the request on March 10, 2010. Third amended complaint p. 14, fourth
amended complaint p. 6.

- on March 25, 2010, Defendant Robinson responded to a grievance
  advising the plaintiff that it would be returned unprocessed "because a
  decision had already been made on the issue of medical treatment." Fourth
  amended complaint p. 7. The plaintiff does not allege that Defendant
  Robinson played any role in the decisions about his medical treatment.

Concerning Ms. **Kemp**, an employee in the DOC central office, the plaintiff
fails to allege that she committed any act that caused him any harm. Her name is
mentioned only on pages 2 and 7 of the fourth amended complaint. No allegations
about her allegedly wrongful behavior are made at either place. Mr. George
elaborated in his deposition on why he sued Ms. Kemp: because she was the
department secretary's authorized representative and signed a grievance response
on the secretary's behalf. Plaintiff's deposition (exhibit 2) pp. 40-41.

Mr. McNeil now is the chief of police in Quincy, but from February 2009 to
February 2011 he was secretary of the department. McNeil declaration (exhibit 9)
p. 1. He states that he is not a medical professional and delegated the responsibility
for providing medical care to inmates to subordinates trained in the medical arts.
He was not, for instance, involved in the drafting, adoption or implementation of
medical policies or protocols addressing standards for the provision of treatment
for medical conditions such as hepatitis C. The development and implementation
of medical treatment protocols was the responsibility of the assistant secretary of
health services. He reasonably relied on the expertise of the assistant secretary, as a
medical professional, to adopt and to administer medical treatment protocols that
were consistent with community standards of care. He had no reason to believe
that such reliance was unreasonable. He never, for instance, received any

10

complaints that the manner in which the department provided treatment to inmates with hepatitis C infections did not meet community standards. McNeil declaration (exhibit 9) p. 1.

As secretary, Mr. McNeil established a process for the handling of inmate grievances directed to the Office of the Secretary. Such grievances were always directed either to the department's Office of the General Counsel or the assistant secretary of institutions for investigation and a response. Grievances concerning medical care were directed to the assistant secretary for health services for investigation and the drafting of a response. Consequently, he never saw any grievances about medical care addressed by Mr. George to the Office of the Secretary, and he has no knowledge of him as an individual, of any medical condition from which he may have suffered during his incarceration or of any care he may have been given for any medical condition, including hepatitis C. Likewise, he never directed anyone to provide care or to withhold care of any nature regarding Mr. George. McNeil declaration (exhibit 9) p. 2.

Now retired, Ms. Flores was warden at Baker Correctional Institution from June 2006 to February 2011. As warden, she delegated the processing of inmate grievances directed to the office of the warden to Ms. Robinson. It was Ms. Robinson's responsibility to analyze all grievances, to forward the grievance to the individual within the facility with the knowledge of the matter raised in the grievance for investigation and the drafting of a response and ensuring that the inmate received a timely response. Ms. Flores did review and sign some classes of grievances. However, medical grievances were among those delegated to Ms. Robinson for processing and a response. She did not see any such grievances, review them after answers had been drafted for them, or answer or direct an answer to any grievances myself, including any institutional-level grievances filed by

11

Robert George, who Ms. Flores understands was an inmate at Baker CI from 2009 to 2011.  She played no role in any decisions involving Mr. George's medical treatment, and she has have no personal knowledge as to any medical treatment provided to Mr. George or of any response to any particular institutional-level grievance he may have filed during his stay at Baker CI. Furthermore, she has no recollection of Mr. George. At no time, including the period of Mr. George's incarceration at Baker CI, did Ms. Flores receive any grievances or other complaints about the medical staff's treatment of an inmate with hepatitis C. Flores declaration (exhibit 10) p. 1.

Ms. Robinson has been assistant warden for programs at Baker CI since November 2009. She does not supervise the provision of medical care to inmates, has no control over the diagnosis or treatment of medical conditions of inmates, and lacks any authority to direct facility medical staff in their treatment decisions, or to direct the adoption of any medical policy or protocol. Ms. Robinson recalls Robert George from the time he was an inmate at Baker CI from grievances he filed with the Office of the Warden concerning complaints about medical care for hepatitis C, which she understood he had contracted at some time in the past. Ms. Robinson states that Mr. George's grievances about his medical care were treated as any other grievance that came to her office. That is, grievances directed to the warden or an assistant warden came to Ms. Robinson and she referred them to the appropriate professional for investigation and the drafting of a response. Thus, Mr. George's complaints were directed to Baker CI medical personnel who investigated his complaints and wrote the responses. As the facility representative, Ms. Robinson merely signed the responses that eventually were sent to Mr. George (except in one instance when another assistant warden signed in her absence). She has no personal knowledge of the accuracy of Mr. George's complaints or of the

12

responses. Ms. Robinson relied on the medical staff to provide the appropriate responses because she has no medical expertise. In fact, because she has no medical expertise, she cannot say one way or another whether any course of treatment for hepatitis C (or any other complex medical condition) is appropriate or not. At no time, including the period of Mr. George's incarceration at Baker CI, did Ms. Robinson receive any grievances or other complaints about the medical staff's treatment of an inmate with hepatitis C. Robinson declaration (exhibit 11) pp. 1-2.

Ms. Kemp, now also retired, was the bureau chief of the Bureau of Inmate Grievance Appeals from 1994 to March 31, 2011. The Secretary of the Department of Corrections delegated the processing and provision of a response to inmate grievances directed to the Secretary to the bureau. The bureau received approximately 40,000 grievances a year. Approximately 10,000 of those were concerning medical issues. Ms. Kemp's role in the grievance process was to manage the process by which grievances where handled. She was responsible for logging in all grievances, directing them to the professional within the department best able to respond to the inmate's particular concern, tracking the grievance and its response, and ensuring that a response was ultimately sent to the inmate. Grievances about the provision of medical care were referred to the office of health services for the drafting of a response. Ms. Kemp never personally wrote responses on medical issues. While she may have signed grievances from time to time, her signature did not mean that she prepared the response, was knowledgeable about the subject of the grievance or vouched for the response. Her signature merely signified that the response had been provided. Regarding medical grievances, Ms. Kemp has no medical training or access to inmate medical records which would enable her to provide any response. She relied upon the expertise of the

13

department's medical staff to answer such grievances appropriately and to ensure than inmates received an appropriate level of medical care. Ms. Kemp never received any complaints about the medical staff's inability to deliver appropriate medical care to inmates generally, or to Mr. George in particular. She has no personal knowledge about Mr. George, and no present recollection of processing or of participating in a response provided to any grievances filed with the Office of the Secretary by Mr. George. Kemp declaration (exhibit 12) p. 1-2.

Mr. George was released from prison on March 17, 2011, after filing this action. Plaintiff's deposition (exhibit 2) p. 10. He has not sought any treatment for his hepatitis C infection since his release, nor has he been evaluated by any medical professional for any harmful effects of the infection. Plaintiff's deposition (exhibit 2) p. 85.

Nonetheless, Mr. George has numerous physical complaints that he attributes to the infection: largely pain all over his body, in his back, hips, his joints, his muscles, his head, as well as respiratory problems. Plaintiff's deposition (exhibit 2) pp. 12-14. Despite his physical complaints, however, the plaintiff is engaged in the renovation of a house that involves fixing the roof and hanging sheetrock in return for a place to live. Plaintiff's deposition (exhibit 2) p. 11.

After reviewing the Plaintiff's deposition (exhibit 2) and his medical records, Dr. Rahangdale says these symptoms are "most unlikely" to be related to a hepatitis C infection. Expert's report (exhibit 1) p. 3. Dr. Rahangdale notes that medical personnel (actually Dr. Le) continued to follow Mr. George and periodically test his liver functions, as well as provide him medical exams. Expert's report (exhibit 1) p. 3. The notes of these tests and examinations do not, in Dr. Rahangdale's opinion, "show any sign of liver disease." Expert's report (exhibit 1) p. 3. In sum, Dr. Rahangdale says, "All in all, the plaintiff does not have a preponderance of

complaints in the medical record or even presently at recent deposition to suggest a sign-symptom complex of hepatitis C related medical complications. As most patients will remain asymptomatic for decades, unaffected clinically for decades, and many even asymptomatic for life, there is not a preponderance of signs or symptoms to suggest the plaintiff has suffered irreparable harm from not receiving treatment for hepatitis C infection." Expert's report (exhibit 1) p. 4. In short, the plaintiff has not suffered "any measurable adverse consequences from the refusal of the department to provide therapy with pegylated interferon and ribavirin." Expert's report (exhibit 1) p. 5.

## ARGUMENT

### I.     NEITHER DR. LE NOR DR. SOLORZANO ACTED WITH DELIBERATE INDIFFERENCE.

The record shows that Dr. Le, the chief medical officer at Baker Correctional Institution, evaluated the plaintiff, ordered tests, referred him to a specialist, recommended treatment, and, when the plaintiff did not get the recommended treatment—a biopsy—Dr. Le appealed the decision not to go forward. Nor was Dr. Le—by the plaintiff's own admission—in a position to provide the treatment he sought. Meanwhile, Dr. Le continued to monitor the plaintiff's liver functions and provided him with period examinations. These facts establish that Dr. Le did not act toward the plaintiff with deliberate indifference.

Dr. Solorzano's situation is a little different. He did not directly treat the plaintiff. Instead, he denied a request for a biopsy, and thus further treatment, not arbitrarily, but for *medical reasons*: the fact that the standard drug therapy posed significant dangers to others besides the plaintiff through unprotected sexual contact for at least six months after the end of active treatment. That decision was consistent with the community standard of care.

15

The general principles governing prison medical adequacy claims are well established. "First, the plaintiff must prove an objectively serious medical need. Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005). Third, the plaintiff must prove "causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir.2009).

To prove deliberate indifference, the plaintiff "must prove three things: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.' *Id.*; see also *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) (noting, after *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994), that gross negligence fails to satisfy state-of-mind requirement for deliberate indifference)."

> Demonstration of the level of subjective knowledge necessary to impute to the Officers a sufficiently blameworthy state of mind consists of two steps: the Officers "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] must also draw the inference." Farmer, 114 S. Ct. at 1979 (emphasis added).

*Bozeman v. Orum*, 422 F.3d at 1272

A serious medical need is a condition diagnosed by a physician or one so obvious that even a lay person would easily recognize the need for a doctor's intervention. *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994). *Kelley v. Hicks*, 400 F.3d 1282, 1284 n. 3 (11th Cir. 2005). The condition must be such that to leave it untreated creates a risk to health that is so grave as to violate contemporary standards of decency. *Kelley*, at 1284; *R.T. v. Gross,* 298 F. Supp. 2d 289, 295 (N.D. N.Y. 2003) ("It must be a condition of urgency which, if not adequately treated, would produce death, degeneration or

16

extreme pain."). In general, serious medical needs are those requiring immediate medical attention. *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010).

For medical treatment to rise to the level of a constitutional violation, the care must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir.1991) (citation omitted). The plaintiff must demonstrate that defendant's response to his medical need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir.2000)

Thus, care provided need not be perfect "or even very good." *Harris v. Thigpen*, 941 F.2d at 1510. Inmates are only constitutionally entitled to "minimally adequate care." Id, at 1509.

A defendant who responds reasonably to the plaintiff's complaints is not deliberately indifferent. *Nimmons v. Aviles*, 2011 WL 165433 * 2 (11th Cir. 2011).

The referral of an inmate to a specialist refutes an inference of deliberate indifference. *Whitehead v. Burnside*, 403 Fed.Appx. 401 (11th Cir. 2010) (medical director not deliberately indifferent when he referred plaintiff to an orthopedic specialist for injured knee).

Here, Dr. Le acted reasonably by evaluating the plaintiff's liver enzyme levels, ordering a sonogram, recommending specific treatment, and referring him to a specialist. Then he continued to test and to monitor Mr. George's condition.

His actions were similar to those of the physicians in *Sealey v. Pastrana,* 399 Fed.Appx. 548, 533 (11th Cir. 2010), and *Grayton v. McCoy,* 593 F.3d 610, 622-623 (7th Cir. 2010), in which the courts held they had not acted with deliberate indifference. See also, *Taylor v. Ortiz,* 410 Fed.Appx. 76, 79 (10th Cir. 2010) (physician took twice yearly blood sample to monitor liver functions of inmate

infected with hepatitis C; not deliberately indifferent to inmate claim he should have been provided with antiviral drugs).

Moreover, Dr. Solorzano rather than Dr. Le was ultimately responsible for the decision not to render treatment, which insulates Dr. Le from liability in the same way as it did the physician in *Sealey v. Pastrana,* 399 Fed.Appx. at 533.

The fact that Dr. Le had no ability to provide either a biopsy or the plaintiff's preferred treatment also absolves him of liability. *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D. N.Y. 2002) (defendant who lacked authority over situation could not be liable); *Diaz v. Adams,* 2010 WL 3433556 *3 (C.D. Ill. 2010) (no liability when there is no realistic opportunity to override decision, given the chain of command).

Dr. Solorzano's decision was not deliberately indifferent either. His decision had a sound medical basis, rooted in a demonstrated risk of substantial harm arising from the use of ribavirin/interferon, especially the high degree of risk of serious birth defects, should any patient's sexual partner became pregnant, and the inability of the department to provide the required counseling if the inmate is released from prison before the running of the six-month, post-release window of danger. Moreover, as Dr. Rahangdale's report makes clear, a delay in treatment for most of those infected with hepatitis C is unlikely to have serious adverse effects, since only 10-20 percent eventually develop liver ailments and then only after decades. Mr. George's medical record indicates he was not yet at risk of falling into that group, and nothing in the available evidence indicates that Dr. Solorzano had notice of and appreciated such a risk, even if it existed. The fact Dr. Solorzano's decision rested on such a substantial medical basis means he could not have the necessary subjective intention to support Eighth Amendment liability. See *Lee v. Cerullo,* 287 Fed.Appx. 145, 148 (3d Cir. 2008) (no liability when plaintiff fails to

show that delay in hepatitis C treatment was for nonmedical reasons); *Davidson v. Texas Department of Criminal Justice,* 91 Fed.Appx. 963, 965 (5th Cir. 2004) (no deliberate indifference when decision not to treat inmate's hepatitis C was consistent with "generally accepted medical standards").

Therefore, judgment for both Dr. Le and Dr. Solorzano is appropriate.

## II.    DR. LE AND DR. SOLORZANO ARE ENTITLED TO QUALIFIED IMMUNITY.

Dr. Le is entitled to qualified immunity because no reasonable physician could anticipate that he would subject himself to liability when he had no ability to provide the preferred treatment, sought to obtain permission for that treatment from others, and continued to monitor the plaintiff for his disease.

Dr. Solorzano is entitled to qualified immunity for following a medical protocol when there was no reason to believe that it was arbitrary, unreasonable or even medically wrong, and that in fact was consistent with community standards of care.

Qualified immunity protects defendants sued under 42 U.S.C.  s. 1983 from damages if they violated no clearly established federal law. *Johnson v. Irby*, 2010 WL 4721625 *2 (11th Cir. 2010); *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009).

The purpose of qualified immunity is to protect government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003).

To obtain qualified immunity, a state official must prove that he acted within the scope of his discretionary authority. *Gonzalez v. Reno*, 325 F.3d 1234. There is no question that is the case here.

19

Once the state defendant establishes this factor, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Crenshaw v. Lister*, 556 F.3d at 1290. "Courts utilize a two-part framework to evaluate qualified immunity claims. One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citation omitted). If the facts show that a constitutional right has been violated, another inquiry is whether the right violated was 'clearly established.'" *Barnett v. City of Florida, Ala.*, 2010 WL 4864582 *4 (11th Cir. 2010)*; Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

The right at issue must be clearly established at the time the defendant is alleged to have acted. *Youmans v. Gagnon*, 2010 WL 4608409 *3 (11th Cir. 2010). "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right. (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right, id.; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291-1292 (11th Cir. 2009).

"In order to determine whether a right is clearly established, we look to the precedent of the Supreme Court of the United States, this Court's precedent, and the pertinent state's supreme court precedent, interpreting and applying the law in similar circumstances. . . . We have said many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects

the defendant." *Oliver v. Fiorino*, 586 F.3d 989, 902 (11th Cir. 2009)[3]. The law cannot be clearly established by referring to decisions from other circuits. *Trammel v Thomason*, 335 Fed.Appx. 835, 841-842 (11th Cir. 2009)."For a right to be 'clearly established,' previous case law must have developed it in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *GJR Investments, Inc. v. County of Escambia, Fla*., 132 F.3d 1359, 1366 (11th Cir. 1998).

The inquiry is fact-specific; that is, the *exact conduct* alleged or substantially similar conduct must violate clearly established law. *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002); *Danley v. Allen*, 540 F.3d 1298, 1313 (11th Cir. 2008).

When a defendant's actions are arguably reasonable, he is entitled to qualified immunity. *Moore v. Cullman County Commission,* 2006 WL 952276 *2 (11th Cir. 2006).

A defendant's compliance with an agency policy that is objectively reasonable in light of the legal rules clearly established at the time of the alleged bad act warrants a finding of qualified immunity. *Hay v. Thaler,* 2011 WL 1237840 * 7 (S.D. Tex. 2001).

Here, Dr. Le's and Dr. Solorzano's actions were at least arguably reasonable. Dr. Rahangdale's report indicates that the agency policy on which Dr. Solorzano relied was objectively reasonable as well.

Therefore, they are entitled to qualified immunity.

---

[3] Internal quotations omitted.

### III.   MR. MCNEIL AND MS. FLORES CANNOT BE LIABLE MERELY BECAUSE THEY WERE SUPERVISORS.

Mr. George's main complaint about Mr. McNeil and Ms. Flores is that they were supervisors who oversaw the grievance process. He wants to hold them accountable because of that fact alone.

However, respondeat superior does not support liability under 42 U.S.C. s. 1983. The plaintiff must show the defendant's personal involvement in the alleged bad act. *Woody v. Cronic,* 2010 WL 4273261 * 2 (11th Cir. 2010); *Williams v. Santana,* 340 Fed.Appx. 614 (11th Cir. 2009). A sufficient causal connection requires proof that the supervisor instituted an unconstitutional custom or policy, directed subordinates to act unlawfully, or failed to stop subordinates from acting unlawfully when he knew they would. *Gross v. White,* 340 Fed.Appx. 527, 531 (11th Cir. 2009).

The evidence does not support a conclusion that either Mr. McNeil or Ms. Flores initiated an unconstitutional policy, directed subordinates to act unlawfully or knowingly failed to stop subordinates from acting unlawfully. Therefore, the defendants are entitled to judgment.

### IV.   MR. MCNEIL, MS. FLORES, MS. ROBINSON AND MS. KEMP CANNOT BE LIABLE MERELY BECAUSE THEY WERE INVOLVED IN SOME WAY WITH THE DENIAL OF THE PLAINTIFF'S MEDICAL GRIEVANCES.

Each of these defendants is sued because they played some part in receiving or denying a grievance.

Liability cannot rest simply on the denial of a grievance.  See e.g., *Burke v. Thompson*, 2010 WL 1141213 *3 (W.D.Ky. 2010); *Solomon v. Michigan Dept. of Corrections*, 2010 WL 1949558 *2 (W.D.Mich. 2010); *Browder v. Haas*, 2010 WL 3620233 *4 (W.D. Ky. 2010). A prison official involved in the handling of an inmate grievance can only be held liable if he had the authority and the opportunity

22

to prevent the alleged unlawful conduct. *Atkinson v. Cate,* 2012 WL 946590 *3 (E.D. Calif. 2012).

Mr. McNeil and Ms. Flores did not have the opportunity because they did not play any role in the processing of the plaintiff's grievances.

Mr. Robinson and Ms. Kemp did not have the authority to affect events. They reasonably relied on the responses of medical professionals, which they are entitled to do. *Johnson v. Johnson,* 385 F.3d 503, 526 (5th Cir. 2004). Ms. Kemp in particular is entitled to judgment because she was outside the chain of command and could not have changed the result of a grievance response even if she had wanted to do so. *Diaz v. Adams,* 2010 WL 3433556 *3 (C.D. Ill. 2010).

In fact, as nonmedical personnel, all these defendants were entitled to rely upon the fact that the plaintiff was under the care of a physician. *Durmer v. O'Carroll,* 991 F.2d 64, 69 (3d Cir. 1993) (nonmedical personnel could not be found to be deliberately indifferent to inmate's medical needs for not responding to inmate grievance when he was under a physician's care).

## V.   THERE WAS NO CAUSAL CONNECTION BETWEEN THE DENIAL OF THE PLAINTIFF'S GRIEVANCES AND THE HARM HE ALLEGEDLY SUFFERED.

The decision not to provide a biopsy and further aggressive treatment for the plaintiff's hepatitis C infection was made by medical professionals pursuant to a treatment protocol consistent with community standards. The nonmedical defendants were entitled to rely on the judgment of medical professionals in the treatment of so complex a disease. *Durmer v. O'Carroll,* 991 F.2d at 69. Consequently, any decision about the plaintiff's grievances was not causally related to any harm he may have suffered.

## VI.   THE NONMEDICAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Defendants McNeil, Flores, Robinson and Kemp are entitled to qualified immunity for their reasonable reliance on the judgment of the department's medical professionals in implementing the hepatitis C treatment protocol for the same reasons as Dr. Solorzano. They had no reason to believe that reliance on the judgments of medical professionals or compliance with the protocol was unreasonable and violated clearly established law.

## VII.   DR. OGUNSANWO WAS NOT INVOLVED IN ANY TREATMENT DECISION AFFECTING THE PLAINTIFF AND THEREFORE HE IS ENTITLED TO JUDGMENT.

Because Dr. Ogunsanwo was not involved in the decision not to treat the plaintiff, the necessary causal connection between his acts and the alleged harm does not exist. Therefore, he is entitled to judgment. *Corpus v. Teion-Wells*, 2010 WL 179412 *3 (M.D. Fla. 2010).

## VIII.   THE PLAINTIFF WAS NOT HARMED BY ANY DELAY IN PROVIDING TREATMENT. THEREFORE, THE DEFENDANTS CANNOT BE FOUND LIABLE FOR AN EIGHTH AMENDMENT VIOLATION, AND THE PLRA PROHIBITS A JUDGMENT IN FAVOR OF THE PLAINTIFF.

The plaintiff must show by verifiable medical evidence that he was harmed by the failure to provide treatment. *Whitington v. Moschetti,* 432 Fed.Appx. 767,773 (10th Cir. 2011) (judgment for defendants where there was no medical evidence that delay in treating inmate's hepatitis C infection resulted in substantial harm); *Whitehead v. Burnside*, 403 Fed.Appx. 401, 402 (11th Cir. 2010) ("When a plaintiff alleges that delay in medical treatment shows deliberate indifference, he 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.' *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187-88 (11th Cir.1994), overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 739 n. 9, 122 S.Ct. 2508, 2515 n. 9, 153 L.Ed.2d 666

(2002). '[D]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.' *Id*. at 1189. Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records.'); *Corpus v. Teion-Wells*, 2010 WL 179412 *7.

Moreover, the Prison Litigation Reform Act, 42 U.S.C.  s. 1994e(e), requires a showing of physical injury in order to obtain compensatory damages. *Geiger v. Jowers,* 404 F.3d 371, 375 (5th Cir. 2005).

Here, the expert testimony establishes that the plaintiff has suffered no discernible harm from the department's decision not to provide treatment.

Therefore, the defendants are entitled to judgment.

## CONCLUSION

For these reasons, the court should dismiss the complaint.

RESPECTFULLY SUBMITTED,

PAMELA JO BONDI
ATTORNEY GENERAL

/s *Jason Vail*

JASON VAIL
Assistant Attorney General
Florida Bar no. 298824

Office of the Attorney General
PL-01
The Capitol
Tallahassee, FL 32399
(850)414-3300

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to counsel of record through use of the Court's CM/ECF system on November 28, 2012.

s/ *Jason Vail*