UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


ROBERT KARL GEORGE,

                          Plaintiff,

v.                                              Case No. 3:10-cv-688-J-34JBT

WALTER A. MCNEIL, et al.,

                          Defendants.

_____


## REPORT AND RECOMMENDATION[1]

        Plaintiff Robert Karl George ("Plaintiff" or "George"), while an inmate of the

Florida penal system,[2] initiated this action by filing a pro se Civil Rights Complaint

(Doc. 1) under 42 U.S.C. § 1983 on August 6, 2010.   Later, Plaintiff filed an

Amended Complaint (Doc. 13) on August 23, 2010, a Second Amended Complaint

(Doc. 17) on October 18, 2010, and a Third Amended Complaint (Doc. 25) on

_____

        [1] "Within 14 days after being served with a copy of [this Report and
Recommendation], a party may serve and file specific written objections to the proposed
findings and recommendations.  A party may respond to another party's objections within
14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. §
636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination
of those portions of the report or specified proposed findings or recommendations to which
objection is made."  28 U.S.C. § 636(b)(1).

        [2] The Florida Department of Corrections released George (Inmate No. 283897) on
March 17, 2011. See http://www.dc.state.fl.us/InmateReleases.  George now resides in
Jacksonville, Florida.

1

January 3, 2011. On September 8, 2011, Plaintiff, through counsel,[3] filed a Fourth Amended Complaint ("Complaint") (Doc. 82).[4] In this operative Complaint, Plaintiff presents two counts that are based on alleged violations of the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983. Both counts allege that Defendants were deliberately indifferent to Plaintiff's serious medical needs during his period of incarceration. In the second count, Plaintiff claims such indifference was pursuant to a policy under which a prisoner is denied certain medical care if his tentative release date is less than eighteen (18) months away.

In the Complaint, Plaintiff names the following Defendants, "in both their individual and official capacities": (1) Walter A. McNeil, the Florida Department of Corrections ("FDOC") Secretary at that time; (2) Celeste Kemp, a representative for the FDOC Secretary; (3) Melody Flores, the Warden at Baker Correctional Institution ("BCI"); (4) Susan Robinson, the Assistant Warden for Programs at BCI; (5) Dr. Trung Van Le, M.D., a family practice primary care physician and the Chief Health Officer at BCI; (6) Dr. Ronald Solorzano, M.D., the FDOC Region II Medical Executive Director; (7) Dr. Olugbenga Ogunsanwo, the Deputy Secretary of Health Services at BCI[5]; and (8) John Doe, a Utilization Management Authorization

---

[3] See Order (Doc. 50), filed March 8, 2011 (appointing counsel); Notice of Appearance (Doc. 63), filed March 17, 2011.

[4] The Court will refer to Plaintiff's exhibits, attached to the Complaint, as "Complaint, P. Ex."

[5] Although Plaintiff asserts that Dr. Ogunsanwo was the Deputy Secretary of Health
(continued...)

employee at BCI.  This cause is before the Court on Defendants' Renewed Motion for Summary Judgment[6] (Motion for Summary Judgment) (Doc. 108), filed November 28, 2012.[7] Plaintiff has responded.  <u>See</u> Plaintiff's Response to Defendants' Motion for Summary Judgment (Plaintiff's Response) (Doc. 110); Exhibits (Docs. 110, 112).[8]  Pursuant to the Standing Order (Doc. 1) in Case No. 3:12-mc-44-J-99MMH-JBT, this dispositive motion has been referred to the undersigned for issuance of a report and recommendation.  For the reasons stated herein, the undersigned **RECOMMENDS** that the Motion for Summary Judgment be **GRANTED**.

## I.    Summary of Plaintiff's Complaint

Plaintiff alleges the following facts in support of his claims that the Defendants were deliberately indifferent to his serious medical needs when they refused to provide him treatment for his Hepatitis C infection,.  Upon entering FDOC custody on or about June 10, 2009,[9] George informed the examining physician at the

---

[5](...continued)
Services at BCI, <u>see</u> Complaint at 2, paragraph 8, Dr. Ogunsanwo states that he was employed at the FDOC, <u>see</u> Declaration of Olugbenga Ogunsanwo (Doc. 108-8).

[6] This motion was filed on behalf of all Defendants, except the John Doe Defendant, who remains unknown.

[7] The Court will refer to Defendants' exhibits as "Def. Ex."

[8] The Court will refer to Plaintiff's exhibits as "P. Ex."

[9] According to the FDOC website, George entered FDOC custody on June 11, 2009. <u>See</u> http://www.dc.state.fl.us/InmateReleases.

Reception and Medical Center ("RMC") that he had a Hepatitis C infection. Complaint at 3, paragraph 14. In response to Plaintiff's request for medical treatment "as soon as possible," the examining physician advised him that he would be provided medical treatment for "his serious medical condition" when he arrived at his permanent location within the prison system. Id. On or about June 15th, when Plaintiff arrived at his permanent location, a classification employee advised him that he had twenty-five and one-half (25 ½) months remaining to serve on his sentence. Id., paragraph 15. At that time, his earliest possible release date was approximately March 17, 2011. Id.

In July 2009, the FDOC transferred him to Santa Rosa Correctional Institution. Id., paragraph 16. Plaintiff sent an Inmate Request, asking to see a physician for treatment of his Hepatitis C infection and progressive liver disease. Id., paragraph16. According to Plaintiff, "[s]oon thereafter," the physician at Santa Rosa Correctional Institution ordered a blood test and advised Plaintiff that he could expect treatment soon. Id., paragraph 17.

In August 2009, the FDOC transferred Plaintiff to BCI. Id., paragraph 18. Again, Plaintiff sent an Inmate Request, asking to see a physician and to be treated for his Hepatitis C infection and progressive liver disease. Id. The BCI physician (now deceased) ordered more blood tests and a genotype test. Id. at 4, paragraph 19. Plaintiff was informed that the BCI physician would meet soon with the Chief

Health Officer, Defendant Dr. Trung Van Le, concerning Plaintiff's treatment plan. Id.

In September 2009, Defendant Le met with Plaintiff and informed him that he had a Type 1 Hepatitis C infection, and that his liver enzyme levels were double what was normal. Id., paragraph 20. Additionally, Defendant Le advised Plaintiff that these levels showed that the infection was "actively progressing" and "could be fatal." Id. Providing Plaintiff with a copy of the medical report, Defendant Le notified Plaintiff that his enzyme levels do not have to be elevated for irreparable damage to occur. Id., paragraph 21. Defendant Le also told Plaintiff that he was referring him to Dr. Alejandro Radi, M.D., a specialist at RMC, for a liver sonogram to assess the damage that had already occurred. Id., paragraph 22. Additionally, Defendant Le recommended treatment for Plaintiff with the medications interferon and ribavirin and advised that Plaintiff had plenty of time to complete the year-long treatment plan. Id., paragraph 23.

In November 2009, Plaintiff went to RMC for a liver sonogram. Id., paragraph 24. On December 5, 2009, Plaintiff submitted a medical grievance, asserting that the FDOC had not yet begun medical treatment even though he had been in custody for six months. Id. at 4-5, paragraph 25. In that grievance, he specifically stated:

> I informed D.O.C. I have Hepatitis C when I saw the doctor
> on June 15th and asked [the] Doctor to [be] treated for the
> Hepatitis C. It has been 6 months and no treatment. If
> you are not going to start treatment very soon[,] please let
> me [k]now so I can contact attorneys I've been discussing

> this issue with. Write back please and let me know what you are doing?
>
> . . . .
>
> Also need refills o.k[.]ed for prescription for 800 mg Motrin for chronic pain. Refills ended this month.

Complaint, P. Ex. A, Inmate Request, dated December 5, 2009 (capitalization omitted). In responding to the grievance, the Senior Health Services Administrator at BCI, stated:

> Review of your medical record indicates that you have already started diagnostic testing (labs and a liver sonogram). The doctor has also submitted a referral to a specialist; and we are currently waiting for its approval. I recommend that you continue to practice cooperation and patience regarding this process. However, if you feel it is necessary to contact a lawyer, do so. [I]t will not affect the outcome of the approval process. You may check on the status of refills at sick call[.]

Id., Response, dated December 8, 2009.

On January 5, 2010, Plaintiff submitted a second medical grievance, in which he states:

> I have requested medical treatment for my Hepatitis C since June 2009 when I went to Butler RMC. My liver blood enzyme levels have been tested monthly and are elevated. The doctor referred me 2+ months ago to see [a] specialist. I had [a] sonogram of my liver 6-7 weeks [ago.] But have not been sent to see doctor. This condition has been left untreated now 7 months and treatment takes up to 1 year. I am getting down to 1 year TRD [(tentative release date)] soon. I am requesting to see doctor (specialist ...) it seems your medical staff is attempting to wait until it can say I do not have time left for treatment. I

> am writing my attorneys at Morgan and Morgan in
> Jacksonville, and when this request is received I will
> grieve Tallahassee. Lawsuit proceeds.

Complaint, P. Ex. B, Grievance Request, dated January 5, 2010.

On or about January 12, 2010, Plaintiff saw Dr. Radi, who advised Plaintiff that his viral load was extremely high, which created a dangerous health condition. Complaint at 5, paragraph 29. Dr. Radi informed Plaintiff that his sonogram showed cirrhosis and scarring which leads to liver failure. Id. Dr. Radi also told Plaintiff that he needed antiviral therapy to halt the progression of the damage caused by the untreated Hepatitis C infection. Id. Finally, Dr. Radi told Plaintiff he should immediately begin treatment, starting with a liver biopsy. Id.

On January 14, 2010, the Senior Health Services Administrator responded to Plaintiff's January 5th grievance, stating:

> You were seen by the specialist on 1/12/10. You should
> understand that all non-emergent referrals are on a
> waiting list - you should also learn to be patient and allow
> us time to do the treatment required.

Complaint, P. Ex. B, Response, dated January 14, 2010.

Three weeks having passed since Dr. Radi's January 12th recommendations, Plaintiff filed a third medical grievance on February 2, 2010, in which he stated:

> I have requested treatment for my Hep. C since June 2009
> and medical here at Baker has done little to help without
> me constantly filing grievances after months[;] finally on
> Jan 14th I saw Dr. Radi at Butler who said I would be back
> within 2 weeks for a biopsy of my liver as he approved my
> treatment. It has been 3 weeks now and medical here at

> Baker C.I. has not taken me for my follow up. I am writing Tallahassee this time[.] The only reason I saw Dr. Radi on January 14th was because I sent a grievance to the Warden and now medical is still not doing its job. Also 3-4 weeks ago I was told that I had a dr. appt to get Motrin .... I have been billed 3 times by medical $5 each while trying to get my Motrin and still haven't gotten it set for refills. I have all the evidence to show what you people do. Please do something right!

Complaint, P. Ex. C, Grievance, dated February 2, 2010. In response, M. Arzie, with

Health Services at BCI, stated:

> On January 29, 2010, Dr. Le notified you that the Liver Biopsy had been denied by U.M. [(Utilization Management)] .
>
> You again where [sic] seen by Dr. Le on 2-12-2010 concerning your sinuses, with no new complaints concerning your Hep. C.
>
> Your current treatment is being managed thoroughly and appropriately.

Id., Response, dated February 17, 2010.

On or about February 12, 2010, Defendant Le informed Plaintiff that he was

denied the liver biopsy because there were less than eighteen (18) months left until

his tentative release date.[10] Complaint at 6, paragraph 32. On or about that same

date, Plaintiff filed a Request for Administrative Remedy or Appeal to Defendant

McNeil, the Secretary of the FDOC, to appeal the decision to deny Plaintiff treatment

---

[10] In the Complaint, Plaintiff states: "On information and belief, it is a practice of the Defendants to deny a prisoner in custody at Baker C.I. medical care where the TRD [(tentative release date)] is less than eighteen (18) months." Complaint at 9, paragraph 54.

for his Hepatitis C condition. Id., paragraph 33. Defendant McNeil's response to the appeal was that Plaintiff could initiate a grievance at the institutional level; however, no medical treatment was initiated for Plaintiff's condition. Id.

On or about February 23rd and March 2, 2010, Plaintiff filed Requests for Administrative Remedy or Appeal to BCI Assistant Warden Defendant Susan T. Robinson, requesting medical care and detailing the FDOC's denial of medical treatment. Complaint, P. Ex. D. On or about March 10, 2010, Defendant Robinson denied Plaintiff's grievance, stating Plaintiff would be treated by a physician at BCI. Complaint at 6, paragraph 35. Additionally, Defendant Le signed the grievance response, stating he would be the physician treating the Plaintiff; however, no medical treatment was initiated for Plaintiff's condition. Id. at 6-7, paragraph 35. After receiving the denial, that same day, Plaintiff filed another Request for Administrative Remedy or Appeal to the BCI Warden Defendant Melody Flores. Id. at 7, paragraph 36. On or about March 15, 2010, Plaintiff filed another Request for Administrative Remedy or Appeal to Defendant McNeil. Complaint, P. Ex. E.

On or about March 25, 2010, Plaintiff received a response to his Requests for Administrative Remedy or Appeal, signed by Defendants Robinson and Le, stating that his grievance was being returned unprocessed because a decision was already made on the issue of medical treatment. Complaint at 7, paragraph 38. On or about March 26, 2010, Plaintiff filed another Request for Administrative Remedy or Appeal

to Defendant McNeil.  Complaint, P. Ex. F.  On or about May 26, 2010, Defendant McNeil denied the March 26, 2010 grievance.  Complaint at 7, paragraph 40.

Based upon the factual allegations set forth above, Plaintiff asserts that: (1) the Defendants were deliberately indifferent to Plaintiff's serious medical needs, and the Defendants denied him medical treatment for Hepatitis C from June 2009 until his release date of March 17, 2011, see id. at 8, 9; (2) the Defendants were personally aware of Plaintiff's serious medical needs, the failure to treat Plaintiff's medical condition, and the substantial risk of serious harm to Plaintiff as a result of the lack of treatment, see id. at 7, paragraph 41; (3) the supervising Defendants knew their subordinates needed "to make corrections" relating to Plaintiff's medical treatment, see id. at 8, paragraph 42; and (4) the supervising Defendants directed subordinates to act unlawfully as to Plaintiff's treatment, knew that their subordinates would act unlawfully and failed to stop them, or created a custom or policy of denial of medical care to persons like Plaintiff, resulting in deliberate indifference to Plaintiff's constitutional rights, see id.

As relief, Plaintiff requests that the Court: (1) enter judgment on behalf of Plaintiff against all Defendants on all counts; (2) award Plaintiff compensatory damages against the Defendants in amounts to be determined by the jury; (3) award Plaintiff reasonable attorneys' fees, court costs, expenses, pre-judgment interest, and post-judgment interest; (4) award Plaintiff punitive damages against the

Defendants in their individual capacities; and (5) award such other or further equitable and monetary relief as the Court deems appropriate. Id. at 10.

## II.     Summary of Defendants' Motion for Summary Judgment

The Defendants contend that the Court should grant summary judgment in their favor. First, they assert that Defendant Le, as Plaintiff's primary care physician, did not act with deliberate indifference to Plaintiff's serious medical needs. Motion for Summary Judgment at 2, 15-19. Next, they argue that Defendant Solorzano also did not act with deliberate indifference when he denied a request for a liver biopsy. Id. at 15-19. Additionally, they claim that there was no causal connection between the denial of the Plaintiff's grievances and any harm Plaintiff allegedly suffered, and that the Defendants, acting as supervisors, are not liable under the Eighth Amendment. Id. at 22-23. They also argue that Defendant Ogunsanwo was not involved in any decisions concerning Plaintiff's medical treatment, and is therefore entitled to summary judgment. Id. at 24. Finally, they claim that they are entitled to qualified immunity. Id. at 19-21, 24.

In sum, the Defendants argue that they were not deliberately indifferent to Plaintiff's serious medical needs, but instead provided medical care to Plaintiff in accordance with the FDOC protocol and the Eighth Amendment. In support of Defendants' assertions, they submitted the following exhibits: (1) Def. Ex. 1, Declaration and Expert Report of Sandeep Rahangdale, M.D. ("Dr. Rahangdale's Declaration"), dated May 23, 2012; (2) Def. Ex. 2, Deposition of Robert Karl George

("Plaintiff's Deposition"), dated May 1, 2012; (3) Def. Ex. 3, Spectra Laboratories Patient Reports & Reception and Medical Center Laboratory Results; (4) Def. Ex. 4, Declaration of Trung Van Le ("Dr. Le's Declaration"), dated July 12, 2012; (5) Def. Ex. 5, Declaration of Ronald Solorzano ("Dr. Solorzano's Declaration"), dated July 20, 2012; (6) Def. Ex. 6, Affidavit of Stacey Haynes ("Haynes' Affidavit"), dated July 25, 2012; (7) Def. Ex. 7, Health Services Bulletin 15.03.09/Supplement #3 10/2/08, "Hepatitis C Virus Infection Management" (HSB 15.03.09/Supplement #3), dated October 2, 2008; (8) Def. Ex. 8, Declaration of Olugbenga Ogunsanwo ("Dr. Ogunsanwo's Declaration"), dated July 16, 2012; (9) Def. Ex. 9, Declaration of Walter A. McNeil ("McNeil's Declaration"), dated July 20, 2012; (10) Def. Ex. 10, Declaration of Melody Flores ("Flores' Declaration"), dated August 2, 2012; (11) Def. Ex. 11, Declaration of Susan Robinson ("Robinson's Declaration"), dated August 1, 2012; and (12) Def. Ex. 12, Declaration of Celeste Kemp ("Kemp's Declaration"), dated July 17, 2012.

Providing sworn declarations,[11] the Defendants specifically deny Plaintiff's allegations of wrongdoing. Defendant Trung Van Le, M.D., a family practice physician who was Plaintiff's primary care physician during the relevant time period, states in pertinent part:

---

[11] See West v. Higgins, 346 F. App'x 423, 426 (11th Cir. 2009) (per curiam) ("Federal law does provide an alternative to making a sworn statement, but requires that the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury.") (citing 28 U.S.C. §1746).

I am the chief medical officer at Baker Correctional Institution. I held this position during the period July 2009 to March 2011.

I first became acquainted with Robert George when he arrived at Baker CI in August 2009. I was aware that Mr. George claimed to suffer from a hepatitis C infection, and I authorized laboratory tests, which were performed in September 2009, to determine Mr. George's "viral load" as a result of his hepatitis C infection.[12] I authorized a second laboratory test, which was done in November 2009, to determine the genotype of the infection.[13] The responsiveness to treatment of a given hepatitis infection depends on the genotype; some are more responsive than others. Also in November 2009, I requested that a sonogram be performed by Dr. Radi, a specialist [(gastroenterologist)], and it was done on November 25, 2009. I then arranged for Mr. George to be seen a second time by Dr. Radi in January 2010. Dr. Radi recommended that a liver biopsy be performed. Based on Dr. Radi's recommendation, I requested a liver biopsy. Dr. Ronald Solorzano, who was the DOC Region II Medical Executive Director, denied the request based on Health Services Bulletin 15.03.09/Supplement [#3] 10/2/08 on the ground that the inmate's projected release date would occur in less than 18 months. After that denial, I contacted both the chief administrator of utilization management, at that time Donna Graham, and Lonnie Strickland, who was then the Region II health services administrator, several times to request again that the biopsy be done. It is my understanding that Ms. Graham consulted with the DOC Assistant Director of Health Services in Tallahassee, Dr. Johanson, who concurred with Dr. Solorzano's decision. In any event, my additional efforts to obtain a liver biopsy for Mr George were not successful.

---

[12] See Def. Ex. 3 at 4.

[13] See Def. Ex. 3 at 2.

I had no ability myself to conduct a liver biopsy, as the procedure is outside my area of expertise, or to proceed with ribavirin/interferon treatment, the generally recommend[ed] course of drug treatment for hepatitis C. I had no ability to obtain that drug combination.

In the meantime, I continued to follow Mr. George for hepatitis C by periodically monitoring his liver function through the use of blood tests of his liver enzyme levels (tests were conducted in September 2009, February 2010, August 2010 and February 2011), and through periodic physical examinations. I noted no indication of liver disease or any complications of hepatitis C, in that I detected no indication of profound fatigue, abdominal bloating and discomfort, swelling of the legs, feet and belly, easy bruising and muscle weakness, which are associated with active hepatitis C.

Dr. Le's Declaration at 1-2.

Additionally, Defendant Ronald Solorzano, M.D., in a sworn declaration, describes his medical responsibilities and the January 19, 2010 denial of the request for a liver biopsy made on Plaintiff's behalf.

I have no personal knowledge about the plaintiff or his medical condition. In January 2011,[14] I was the Physician Advisor Committee Chairman for Utilization Management within the Department of Corrections. As Committee Chairman, it was my responsibility to review requests for medical treatment by inmates in correctional institutions throughout the state as part of the department's utilization management process.

In January 2011, I reviewed a request made on the plaintiff's behalf for a biopsy due to a hepatitis C infection. A liver biopsy is a test often used to determine the extent

---

[14] Although Dr. Solorzano refers throughout his declaration to 2011, this appears to be a typographical error as the correct year is 2010.

of any liver damage caused by the infection and informs a practitioner's decision whether to begin an aggressive treatment regime such a ribavirin/interferon drug therapy. By letter dated January 19, 2011, I denied the request based on Health Services Bulletin 15.03.09/Supplement #3 10/2/08, on the ground that the inmate's projected release date would occur in less than 18 months.[15] The bulletin states: "ribavirin, a portion of the current treatment protocol, has the potential to cause birth defects. This can occur not only during treatment, but for a period of up to six (6) months following the completion of treatment. Because the department cannot provide the pharmaceutical manufacturer's mandated counseling to sexual partners of inmate patients being treated with ribavirin, a provision must be made for a six (6) month period of observation within the department after the end of treatment." Treatment with ribavirin/interferon, the recommended therapy for hepatitis C, genotype 1, takes about 48 weeks. Consequently, the department requires that an inmate have at least 18 months remaining on his or her sentence before beginning such treatment because the treatment cannot be safely administered in less than 18 months.

I made this recommendation for medical reasons and reasonably relied on the DOC hepatitis treatment protocol, which reflects the community standard for treating hepatitis C.

Dr. Solorzano's Declaration at 1-2. In sum, Defendant Solorzano states that he denied the request for a liver biopsy on behalf of Plaintiff based on the FDOC's medical protocol for treating Hepatitis C, outlined in HSB 15.03.09/Supplement #3,

---

[15] The Defendants also supplied the affidavit of Stacey Haynes, a Correctional Services Consultant in the Bureau of Classification Management of the FDOC. Based on personal knowledge of the department's procedures relating to the calculation of time served or time remaining to be served on a state prison sentence, Haynes provided a chart on George's tentative release dates based on the amount of earned gain time. See Haynes' Affidavit.

on the ground that George's projected release date was in less than eighteen months.

Next, Defendant Olugbenga Ogunsanwo, M.D., (currently the Assistant Secretary of Health Services for the FDOC; Medical Executive Director of FDOC Region III from May 19, 2006, to April 18, 2010) explains the FDOC regions and concludes that BCI, where George was incarcerated during the period of time at issue, was located in Region II, not Region III, and thus was outside Ogunsanwo's region of responsibility.

> At the time, the department was administratively divided into four regions. Region III was in the middle part of the state, stretching roughly from Putnam and Levy counties in the north to Hillsborough and Polk counties in the south. As regional medical executive director, I was responsible for general oversight and administrative supervision of the medical care delivered to inmates in institutions in Region III. Baker Correctional Institution was in Region II, not Region III. Thus, it was outside my area of responsibility. That is, I was not involved in treatment decisions involving inmates in Region II institutions, nor was I usually consulted about such treatment decisions. No one contacted me about any treatment decisions affecting Robert George, the plaintiff in this lawsuit, nor was I involved in responding to any medical care grievances Mr. George may have submitted.
>
> I have no personal knowledge about Mr. George. It is my understanding that he was at Baker CI for most of his incarceration.

Dr. Ogunsanwo's Declaration.

The pertinent sections of the Health Services Bulletin as to the treatment of

Hepatitis C state:

> c. The treatment for hepatitis C is potentially hazardous and the presence of possible contraindications must be evaluated before undertaking treatment. . . .
>
> d. The treatment of hepatitis C with current therapy is often unsuccessful. Interruption of treatment not only dramatically lessens the chance of success, it may also lead to the development of a virus that is resistant to medication, compromising future attempts at treatment. Currently, county health departments in Florida do not provide medication to treat hepatitis C so inmates may be unable to obtain continued medication after release. Therefore, inmates must have enough time remaining on their sentence to allow for the completion of treatment while incarcerated.
>
> e. Furthermore, ribavirin, a portion of the current treatment protocol, has the potential to cause birth defects. This can occur not only during treatment, but for a period of up to six (6) months following the completion of treatment. Because the department cannot provide the pharmaceutical manufacturer's mandated counseling to sexual partners of inmate patients being treated with ribavirin, a provision must be made for a six (6) month period of observation within the department after the end of treatment.

HSB 15.03.09/Supplement #3 at 1, 2.

Retained by the Defendants to provide an expert medical opinion, Dr.

Sandeep Rahangdale, M.D. (a board certified internal medicine specialist and

Associate Professor of Medicine at Florida State University's College of Medicine)

opines that the treatment of Hepatitis C in the FDOC, at the relevant time of

George's case, "followed established community standard of care guidelines prevalent in the United States." Dr. Rahangdale's Declaration at 1. Explaining the medical basis for the FDOC's treatment protocol, Dr. Rahangdale addresses the evaluation and treatment of inmates infected with the Hepatitis C virus.

> Standard of care treatment of hepatitis C virus is with Pegylated Interferon and Ribavirin, and may be for 48 weeks in patients with genotype 1 infection. This treatment is associated with many side effects, which in some cases can be serious or even fatal and ultimately interfere with treatment outcome. For these reasons, most scientific societies do not currently recommend a broad treatment approach, advocating instead a patient selection process where a multitude of baseline factors are considered as clinical drivers. The first drug of the two drug regimen utilized to treat hepatitis C is pegylated interferon, and it can cause fatal or life-threatening complications such as infections, ischemia, autoimmune reactions, and neuropsychiatric emergencies. In some cases, complications may not resolve even when medications are withdrawn, and post-treatment medication-related side effect management requires patient care continuity for a period of weeks after therapy is completed. Ribavirin, the second component of treatment of hepatitis C, causes birth defects, fetal demise, severe anemia, cardiac disease progression, and is potentially carcinogenic. As such, the U.S. Food and Drug Administration has assigned ribavirin a pregnancy X risk category (positive evidence of fetal risk in humans outweighs ANY possible benefit). This birth defect risk, known as teratogenicity, has been shown at doses that are one hundredth of those prescribed for hepatitis C treatment. As a result, it is recommended that women of childbearing potential and men should use two forms of contraception for six full months after treatment has concluded (as well as during treatment of hepatitis C with ribavirin). This is why the Florida Department of Corrections Technical Instrument 15.03.09 stipulates that a provision must be made for a six

(6) month period of observation within the department after the end of treatment, which may be a minimum of 48 weeks (11 months), in a patient with chronic hepatitis C genotype 1 viral infection. As full initial treatment of eligible genotype 1 hepatitis C patients follows an algorithm that can require 48 weeks of therapy, followed by post-treatment monitoring of at least six (6) months, a period of approximately 18 months of incarceration is appropriate for patients . . . to receive adequate care, monitoring for side effects, and prevention of ribavirin-related toxicity from seminal fluids spread through sexual activity.

Id. at 1-2.

Additionally, Dr. Rahangdale states that a liver biopsy is necessary to determine whether to begin ribavirin/interferon treatment. Id. at 2. However, he notes that, even with this two-drug regimen, over fifty (50) percent of the patients with chronic Hepatitis C are not cured by the treatment. Id. Concerning the eighteen-month treatment period, including the six-month period for observation, Dr. Rahangdale opines:

> . . . I believe the treatment protocol of requiring 18 months of incarceration to be eligible for therapy is safe and prudent. To be consistent with community standards of care when using such potentially toxic treatments, it is advisable that the Florida Department of Corrections retain such a time frame when making decisions whether to pursue treatment of hepatitis C for potentially eligible inmates. It should be noted the department does not have the statutory ability to provide counseling or monitoring post release to the former inmate or their future sexual partners, and thus cannot guarantee that ribavirin toxicity will not be spread to others in the community after an inmate's release from prison. Again, that is why a six month period of incarceration after treatment with ribavirin is ethically mandatory.

Id. at 3.

Regarding Plaintiff's medical condition, Dr. Rahangdale opines:

> My review of the plaintiff[']s medical records, and his own statements in deposition as recent as 5/1/12 does not show conclusive evidence that he is exhibiting signs or even complaining of the major symptoms associated with cirrhosis related to hepatitis C infection . . . .
>
> . . . .
>
> The plaintiff's medical records show that he has a genotype 1, which is more difficult to treat, as achieving a sustained virological response (SVR) is most difficult in patients with genotype 1 hepatitis C virus.[16]
>
> . . . .
>
> In the case of the plaintiff, recall again that chronic hepatitis C viral infection usually runs an asymptomatic course for many years (often many decades), and some patients never develop any symptoms. Further, only about 10 to 20 percent of patients with chronic hepatitis C infection will progress to cirrhosis over an average of 20 years. Symptoms exhibited by the plaintiff, as well as clinical signs on exam by department medical personnel do not support a conclusion that he is suffering from the effects of having hepatitis C viral infection. His main complaints, even to this day, remain related to his joints, which would be most unlikely to be related to hepatitis C infection. Also, even after the department notified the plaintiff that he was not eligible for treatment, his liver function tests were monitored (and in fact were within normal limits in March, 2010, and then slightly elevated in September, 2010, and January 2011, but not any worse than at the time of incarceration in 2009 [AST/ALT were actually lower on 2/07/11 th[a]n 7/16/09]), and he had

---

[16] "There are 6 main genotypes of Hepatitis C, with genotypes 2 and 3 being most amenable to therapy." See Dr. Rahangdale's Declaration at 1.

examinations done until [his] end of sentence that showed no evidence of liver cirrhosis or complications of hepatitis C infection.  In January of 2010, he had a physical exam that did not show any sign of liver disease.  Specifically, he had normal vital signs, no edema, no jaundice, anicteric sclerae, no hepatosplenomegaly, and his exam continued to remain normal even at his last physical exam prior to discharge from the Florida Department of Corrections in 2011 (End of Sentence exam 1/7/11).  His initial complaints related mostly to neck pain, a herniated disc, and the plaintiff stated that he had something fall on his back years ago that caused him to suffer chronic neck and back pain.  Note also that on initial psychosocial screening 6/17/09, by Chandra Mabrey, "Inmate denied any problems with sleep, appetite or energy at this time. Inmate is oriented to time, place, person, and situation. Inmate mood is euthymic; . . . memory is intact."  Finally, while I have not personally examined the plaintiff, in review of the medical chart an intake photo is available from a prior incarceration dated 5/11/04, as is one from 6/11/09.  In these photos the plaintiff appears more muscular and robust appearing in 2009 than in 2004, which would not suggest complications of cirrhosis or any clinical disease due to having hepatitis C (and it would be expected that he appear less robust and muscular if he were suffering complications of hepatitis C at the time of intake photo 6/11/09 versus his prior photo).  The plaintiff's chart documents that the plaintiff has known he has hepatitis C infection since at least 1994, but has not sought treatment for this.  Meanwhile, he has pursued treatment for issues related to orthopedic conditions that he felt were serious.  His medical records state that he didn't pursue treatment over all these years due to the cost of treatment, yet the plaintiff admits to 30 years of cigarette purchase and use, alcohol use, and cocaine use, and illicit drug and alcohol use both may worsen liver disease in any patient, but more so in patients with hepatitis C infection.  Still, the plaintiff did not find enough complaints of possible liver disease to pursue treatment from 1994 to the time of his incarceration in 2009.  His medical records also show that a department of

corrections clinician offered the plaintiff to go to a medical visit back in 2004 to consider whether he may have reasons to pursue further testing for hepatitis C, and he refused (11/12/04).

Symptoms most commonly observed in clinically active hepatitis C include profound fatigue, nausea, abdominal bloating and discomfort, complaints of swelling in the legs, feet, and belly, easy bruising, and muscle weakness. Signs on physical exam include edema (swelling) of the legs, feet, and abdomen, and the patient has none of these signs on any documented exam in his medical record. Other signs include jaundice, icteric sclerae (yellow eyes), ascites (a very protuberant abdomen), ecchymoses (bruising), tachycardia (fast heart rate), dyspnea (difficulty breathing), delirium, or gait imbalance, and there are not any notes in the medical record showing such signs during his incarceration. All in all, the plaintiff does not have a preponderance of complaints in the medical record or even presently at recent deposition to suggest a sign-symptom complex of hepatitis C related medical complications. As most patients will remain asymptomatic for decades, unaffected clinically for decades, and many even asymptomatic for life, there is not a preponderance of signs or symptoms to suggest the plaintiff has suffered irreparable harm from not receiving treatment for hepatitis C infection.

Id. at 1, 3-4.  Dr. Rahangdale concludes:

A careful review of the plaintiff's medical records, research and literature about hepatitis C, current clinical guidelines and community standards of care, as well as my own clinical judgement as a board certified internal medicine specialist and Associate Professor of Medicine at FSU College of Medicine leads to the conclusion that the totality of information available from the plaintiff's deposition and his medical record indicates that his condition did not require immediate treatment during the period of his incarceration.  Nor did the plaintiff suffer any measurable adverse consequences from the refusal of the

department to provide therapy with pegylated interferon and ribavirin. That he even needs therapy to this date in time is not clear, nor does his deposition dated 5/1/12 suggest he is currently suffering from active hepatitis C viral infection. He states his joints hurt, but still has been able to put up sheetrock, re-do a roof, and do other major repairs on a home that do not suggest chronic liver disease complications.

Id. at 5.

Regarding Plaintiff's assertion that the non-medical Defendants were also deliberately indifferent to his serious medical needs when they denied his medical grievances, Defendants McNeil, Flores, Robinson and Kemp submitted sworn declarations outlining their responsibilities and denying any wrongdoing. First, Defendant Walter A. McNeil (the FDOC Secretary from February 2009 to February 2011, who was responsible for the overall operations and management of the department) states in pertinent part:

My responsibilities included general oversight and management of the department's provision of medical care to inmates in its custody in that I was responsible for overall management of the department. However, I am not now, nor was during my time as secretary, a medical professional. Consequently, I delegated the responsibility for providing medical care to inmates to subordinates trained in the medical arts. I was not, for instance, involved in the drafting, adoption or implementation of medical policies or protocols addressing standards for the provision of treatment for medical conditions such as hepatitis C. The development and implementation of medical treatment protocols was the responsibility of the assistant secretary of health services. I reasonably relied on the expertise of the assistant secretary, as a medical professional, to adopt and to administer medical treatment

protocols that were consistent with community standards of care. I had no reason to believe that such reliance was unreasonable. I never, for instance, received any complaints that the manner in which the department provided treatment to inmates with hepatitis C infections did not meet community standards.

I understand that a former inmate has named me as a defendant in a lawsuit alleging the failure to provide adequate treatment for hepatitis C. Evidently, the basis for naming me as a defendant rests on grievances the inmate, Robert George, directed to the Office of the Secretary. I have never met Mr. George, had never heard of him until the filing of the lawsuit, and have no personal knowledge about him.

When I was secretary, the process for handling grievances addressed to the Office of the Secretary was as follows. I never personally reviewed any such inmate grievances. Such grievances were always directed either to the department's Office of the General Counsel or the assistant secretary of institutions for investigation and a response. Grievances concerning medical care were additionally directed to the assistant secretary for health services for investigation and the drafting of a response.

Consequently, I never saw any grievances about medical care addressed by Mr. George to the Office of the Secretary, and I have no knowledge of him as an individual, of any medical condition from which he may have suffered during his incarceration or of any care he may have been given for any medical condition, including hepatitis C.

Likewise, I never directed anyone to provide care or to withhold care of any nature regarding Mr. George.

McNeil's Declaration.

Next, in a sworn declaration, Defendant Melody Flores (the Warden at BCI from June 2006 to February 2011, when she retired from the FDOC) describes her responsibilities as follows:

> As warden, I was responsible for the overall operation of Baker CI. During this period, I supervised Assistant Warden Susan Robinson and Dr. Trung Van Le, the institution's chief medical officer.
>
> When I was warden, I delegated the processing of inmate grievances directed to the office of the warden to Ms. Robinson. It was her responsibility to analyze all grievances, to forward the grievance to the individual within the facility with the knowledge of the matter raised in the grievance for investigation and the drafting of a response, and ensuring that the inmate received a timely response. I did review and sign some classes of grievances. I did not see any such medical grievance, review it after an answer had been drafted for it, or answer or direct an answer to any grievance myself, concerning any institutional-level grievances filed by Robert George, who I understand was an inmate at Baker CI from 2009 to 2011.
>
> I played no role in any decisions involving Mr. George's medical treatment, and I have no personal knowledge as to any medical treatment provided to Mr. George or of any response to any particular institutional-level grievance he may have filed during his stay at Baker CI. Furthermore, I have no recollection of Mr. George.
>
> At no time, including the period of Mr. George's incarceration at Baker CI, did I receive any grievances or other complaints about the medical staff's treatment of an inmate with hepatitis C.

Flores' Declaration at 1-2.

Additionally, Defendant Susan Robinson (the Assistant Warden for Programs at BCI since 2009), in a sworn declaration, describes her responsibilities as well as her recollection of George's medical complaints.

> As assistant warden for programs, I am responsible for assisting the Warden in administering and directing the institution's programs as well as the day-to-day operations of the institution. The Assistant Warden of Programs provides direction and supervision of institutional operations and facilities in the absence of the Warden. The Assistant Warden is responsible for administering, supervising, and developing programs, policies and procedures in the areas of the correctional programs at the institution. This includes programs such as security, classification and records, maintenance and construction, and other inmate activities. However, these responsibilities do not extend to management or supervision of the provision of medical care to inmates at the facility. I have no control over the diagnosis or treatment of medical conditions of inmates and I lack any authority to direct facility medical staff in their treatment decisions, or to direct the adoption of any medical policy or protocol, for that matter.
>
> I recall Robert George from the time he was an inmate at Baker CI from grievances he filed with the Office of the Warden concerning complaints about medical care for hepatitis C, which I understood he had contracted at some time in the past. I have no idea when that might have happened, since I have never seen Mr. George's medical file, nor is there any reason why I might have seen it.
>
> Mr. George's grievances about his medical care were treated as any other grievance that came to my office. That is, grievances directed to the warden or an assistant warden came to me and I referred them to the appropriate professional for investigation and the drafting of a response. Thus, Mr. George's complaints were

directed to Baker CI medical personnel who investigated his complaints and wrote the responses. As the facility representative, I merely signed the responses that eventually were sent to Mr. George (except in one instance when another assistant warden signed in my absence). I have no personal knowledge of the accuracy of Mr. George's complaints or of the responses. I relied on the medical staff to provide the appropriate responses because I have no medical expertise. In fact, because I have no medical expertise, I cannot say one way or another whether any course of treatment for hepatitis C (or any other complex medical condition) is appropriate or not.

At no time, including the period of Mr. George's incarceration at Baker CI, did I receive any grievances or other complaints about the medical staff's treatment of an inmate with hepatitis C.

Robinson's Declaration at 1-2.

Next, in a sworn declaration, Defendant Celeste Kemp (the Chief of the Bureau of Inmate Grievance Appeals from 1994 to March 31, 2011) describes the FDOC's grievance process and her role, as the Bureau Chief.

The Secretary of the Department of Corrections delegated the processing and provision of a response to inmate grievances directed to the Secretary to the bureau. The bureau received approximately 40,000 grievances a year. Approximately 10,000 of those were concerning medical issues. My role in the grievance process was to manage the process by which grievances where [sic] handled. I was responsible for logging in all grievances, directing them to the professional within the department best able to respond to the inmate's particular concern, tracking the grievance and its response, and ensuring that a response was ultimately sent to the inmate.

Grievances about the provision of medical care were referred to the office of health services for the

drafting of a response. I never personally wrote responses on medical issues. While I may have signed grievances from time to time, my signature did not mean that I prepared the response, was knowledgeable about the subject of the grievance or vouched for the response. My signature merely signified that the response had been provided.

Regarding medical grievances, I have no medical training or access to inmate medical records which would enable me to provide any response. I relied upon the expertise of the department's medical staff to answer such grievances appropriately and to ensure than [sic] inmates received an appropriate level of medical care. I never received any complaints about the medical staff's inability to deliver appropriate medical care to inmates generally, or to Mr. George in particular.

I have no personal knowledge about Mr. George, and I have no present recollection of processing or of participating in a response provided to any grievances filed with the Office of the Secretary by Mr. George.

Kemp's Declaration at 1-2. Thus, based upon these facts, Defendants contend that there is no genuine issue as to any material fact, and that each Defendant is entitled to summary judgment as a matter of law based on the record before the Court.

### III.    Plaintiff's Response to Defendants' Summary Judgment Motion

Plaintiff argues that: (1) the United States Supreme Court and the Eleventh Circuit have held that the denial of treatment for Hepatitis C may be a constitutional violation, and thus the Defendants are not entitled to judgment as a matter of law, see Plaintiff's Response at 8-10; (2) the Defendants are not entitled to qualified immunity, see id. at 10-13; and (3) there is a causal connection between the

Defendants' denial of grievances and the harm suffered by Plaintiff, <u>see</u> <u>id</u>. at 13-14. Plaintiff submitted the following exhibits: (1) P. Ex. 1, Deposition of Toung Van Le, M.D. ("Le's Deposition"), dated October 8, 2012; (2) P. Ex. 2, Deposition of Ronald Solorzano, M.D. ("Solorzano's Deposition"), dated October 12, 2012; (3) P. Ex. 3, Letter of Dr. Ronald Solorzano, M.D., to Dr. Le, M.D., dated January 19, 2010; (4) P. Ex. 4, Consultant's Report by Dr. Alejandro Radi, M.D., Gastroenterologist, RMC, dated January 12, 2010; (5) P. Ex. 5, Deposition of Dr. Steven Harris, M.D. ("Harris' Deposition"), dated October 31, 2012; (6) P. Ex. 6, Expert Witness Report for the Plaintiff by Dr. Joel L. Nitzkin, M.D., M.P.H., D.P.A. ("Dr. Nitzkin's Expert Report"), dated December 5, 2012; (7) Plaintiff's Response (Doc. 101), Affidavit of Robert Karl George ("Plaintiff's Affidavit"), dated September 5, 2012. Plaintiff concludes that there are material facts in dispute and that the Defendants are not entitled to judgment as a matter of law. Plaintiff's Response at 14. Thus, Plaintiff requests that this Court deny Defendants' Motion for Summary Judgment and permit this matter to proceed on the merits. <u>Id</u>.

### IV.  Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[17] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

---

[17]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."   Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

> Speculation or conjecture from a party cannot create a genuine issue of material fact. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004).

Whitehead v. Burnside, 403 F. App'x 401, 402-03 (11th Cir. 2010). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Thus, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964

(11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).   In an action involving the alleged violation of plaintiff's federal constitutional rights under 42 U.S.C. § 1983, "assuming all facts in the light most favorable to [plaintiff, as the non-moving party]," summary judgment is properly entered in favor of the defendant where "no genuine issue of material fact exist[s] as to whether [plaintiff]'s constitutional rights were violated."  McKinney v. Sheriff, No. 11-15992, 2013 WL 2377308, *1 (11th Cir. May 31, 2013) (per curiam).

## V.  Analysis[18]

### A.  Claims for Deliberate Indifference to Serious Medical Needs Against Drs. Le, Solorzano, and Ogunsanwo

### 1.  Standard for Deliberate Indifference to Serious Medical Needs

In order to prevail in a 42 U.S.C. § 1983 action, Plaintiff must demonstrate that he was deprived of a federal right by a person acting under color of state law. Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citing Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998)).  In order to state a cognizable claim for inadequate medical treatment under the Eighth Amendment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate

---

[18] As discussed below, because this case is before the Court on Defendants' Motion for Summary Judgment, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Plaintiff.  Rioux v. City of Atlanta, Ga., 520 F.2d 1269, 1274 (11th Cir. 2008) (citation omitted).

indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). The Eleventh Circuit stated:

> These acts or omissions must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir.1986)).

Whitehead, 403 F. App'x. at 403. "It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." Estelle, 429 U.S. at 106 (footnote omitted).

To prevail on a claim of deliberate indifference to a serious medical need, a plaintiff must show (1) an objectively serious medical need; (2) deliberate indifference to that need on the part of the defendant; and (3) causation between the defendant's indifference and the plaintiff's injury. Baez v. Rogers, No. 12-13492, 2013 WL 3306082, *2 (11th Cir. July 2, 2013) (citing Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009)); Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013) (citation omitted).[19]

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

---

[19] In Goodman, the plaintiff was a pretrial detainee, and therefore the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment's prohibition against cruel and unusual punishment as in this case, governed the analysis. See Goodman v. Kimbrough, 718 F.3d at 1331 n.1. However, the standards for deliberate indifference under the Fourteenth Amendment are identical to those under the Eighth Amendment. Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007).

recognize the necessity for a doctor's attention." <u>Mann</u>, 588 F.3d at 1307 (quotation and citation omitted). Alternatively, a plaintiff can establish a serious medical need by showing that a delay in treatment worsened his condition. <u>Id</u>. (citation omitted). "In either of these situations, the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'" <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks and citations omitted). "That Hepatitis C presents a serious medical need is undisputed." <u>Loeber v. Andem</u>, 487 F. App'x 548, 549 (11th Cir. 2012) (per curiam) (citing <u>Brown v. Johnson</u>, 387 F.3d 1344)). Here, the Court will assume that Plaintiff has presented sufficient facts showing a serious medical need.

To establish deliberate indifference, a plaintiff must show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." <u>Goodman</u>, 718 F.3d at 1332 (citation omitted); <u>Thomas v. Bryant</u>, 614 F.3d 1288, 1312 (11th Cir. 2010); <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004). "Conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all." <u>Baez</u>, 2013 WL 3306082, at *2 (citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999)).

Indeed, negligence in providing medical care is not a constitutional violation. Farrow, 320 F.3d at 1243.

The Eleventh Circuit has stated: "The best response to a serious medical need is not required by federal law in these cases." Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (per curiam). Indeed, "[j]udicial decisions addressing deliberate indifference to a serious medical need, like decisions in the Fourth Amendment search-and-seizure realm, are very fact specific." Id. Additionally, the Eleventh Circuit has stated:

> The plaintiff shoulders a heavy burden; even conduct that could be characterized as medical malpractice does not necessarily constitute deliberate indifference. See McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). A difference in medical opinion does not constitute deliberate indifference so long as the treatment provided is minimally adequate. Harris, 941 F.2d at 1504–05.[20] When a plaintiff alleges that delay in medical treatment shows deliberate indifference, he "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187-88 (11th Cir.1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n. 9, 122 S.Ct. 2508, 2515 n. 9, 153 L.Ed.2d 666 (2002). "[D]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." Id. at 1189. Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. See, e.g., Bennett v. Parker, 898 F.2d 1530 (11th Cir.1990).

---

[20] Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991).

Whitehead, 403 F. App'x at 403.

With regard to the subjective component of an Eighth Amendment violation, Plaintiff must establish that Defendants had subjective knowledge of a risk of serious harm to Plaintiff and that Defendants disregarded that risk. Indeed, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

### 2. Summary of Facts

While Plaintiff could not recall exactly when he was initially diagnosed with Hepatitis C, he believed it was during the 1990s. Plaintiff's Deposition at 17-18. The FDOC medical records show that Plaintiff has known since 1994 that he has the Hepatitis C infection. Dr. Rahangdale's Declaration at 4. In June 2009, Plaintiff entered FDOC custody, see Plaintiff's Deposition at 28, and tested positive for Hepatitis C on June 16, 2009, see Def. Ex. 3, Report of Spectra Laboratories, dated June 17, 2009, at 1. In July 2009, the FDOC transferred Plaintiff to Santa Rosa Correctional Institution, and then about three weeks to a month later transferred him to BCI. Plaintiff's Deposition at 28. When Plaintiff arrived at BCI on approximately August 21, 2009, Dr. Cline (now deceased) saw Plaintiff and ordered "some tests." Le's Deposition at 43; Complaint at 4, paragraph 19; Plaintiff's Deposition at 29.

At BCI, Plaintiff saw Defendant Le, who authorized laboratory tests to determine Plaintiff's "viral load" as a result of his Hepatitis C infection. Plaintiff's

36

Deposition at 29; Dr. Le's Declaration at 1.  That test was performed in September 2009.  Def. Ex. 3 at 4.  After that test, Defendant Le ordered a second test to determine the genotype of the infection. Dr. Le's Declaration at 1; Plaintiff's Deposition at 30.  Plaintiff's medical records indicate that he has Genotype 1A, which is more difficult to treat. Def. Ex. 3 at 2; Dr. Rahangdale's Declaration at 1. Also, in November 2009, Defendant Le requested that a sonogram be performed by Dr. Radi, a gastroenterologist; that test was completed on November 25, 2009.  Dr. Le's Declaration at 1; Plaintiff's Deposition at 31-32.  Defendant Le then arranged for Plaintiff to be seen a second time by Dr. Radi in January 2010.  Dr. Le's Declaration at 1.  On January 12, 2010, Dr. Radi recommended that a liver biopsy be performed and that George start treatment after the biopsy.  Id.; Plaintiff's Deposition at 33; Le's Deposition at 73-74.

Based on Dr. Radi's recommendation, two days later on January 14th, Dr. Le requested a liver biopsy. Dr. Le's Declaration at 1; Plaintiff's Deposition at 33-34; Le's Deposition at 74.  On January 19, 2010, Defendant Solorzano (the Physician Advisor Committee Chairman to the FDOC's Utilization Management Department) denied the request based on HSB 15.03.09/Supplement #3 on the ground that Plaintiff's projected release date[21] would occur in less than eighteen months.  P. Ex.

---

[21] In January 2010, Plaintiff's tentative release date was May 29, 2011.  As time progressed and Plaintiff earned additional gain time, his tentative release date moved up, so that Plaintiff was ultimately released on March 17, 2011.  See http://www.dc.state.fl.us/InmateReleases; Haynes' Affidavit.  At the time Dr. Radi, on
(continued...)

3; Dr. Solorzano's Declaration at 1; Dr. Le's Declaration at 1. Solorzano denied the request for a liver biopsy on Plaintiff's behalf based on HSB 15.03.09/Supplement #3 as well as his clinical judgment that the six-month observation period is absolutely necessary. See Solorzano's Deposition at 21-22, 24. Both Solorzano and Defendants' expert Dr. Rahangdale agree with the medical basis for the FDOC's treatment protocol for Hepatitis C. Id. at 26; Dr. Rahangdale's Declaration at 3. Dr. Solorzano explained the medical reasons why an eighteen-month period was necessary, and the risks of ribavirin/interferon drug therapy, including its potential to cause birth defects. He concluded: "I made this recommendation for medical reasons and reasonably relied on the DOC hepatitis treatment protocol, which reflects the community standard for treating hepatitis C." Dr. Solorzano's Declaration at 2.

After the denial of the request for a liver biopsy, Defendant Le contacted both the chief administrator of utilization management, at that time Donna Graham, and Lonnie Strickland, who was then the Region II health services administrator, several times to request again that the biopsy be done. Dr. Le's Declaration at 1; Plaintiff's Deposition at 35 ("I know Dr. Le recommended treatment again. He actually emailed

---

[21](...continued)
January 12, 2010, recommended that Plaintiff have the biopsy and "start treatment after" the biopsy, the "EOS" (end of sentence) date included on the consultation form was estimated to be March 2011. See P. Ex. 4. Nevertheless, both tentative release dates (May 29, 2011, and March 17, 2011) were outside the eighteen-month period of time in which to successfully and safely complete the treatment program.

three or four different people saying: Hey, this man does need to be treated."); Le's Deposition at 31-43, 57-58.

While Defendant Le's additional efforts to obtain a liver biopsy for George were unsuccessful, he continued to monitor Plaintiff.  Dr. Le's Declaration at 1.  Dr. Le periodically monitored Plaintiff's liver function by blood testing of his liver enzyme levels  (the initial test was conducted in September 2009, with follow-up testing in February 2010, August 2010 and February 2011), and through periodic physical examinations.  Dr. Le's Declaration at 2; Def. Ex. 3 at 6, 7.  Dr. Le noted no indication of liver disease or any complications of Hepatitis C, in that he detected no indication of profound fatigue, abdominal bloating and discomfort, swelling of the legs, feet and belly, or easy bruising and muscle weakness, which are associated with an active Hepatitis C infection. Dr. Le's Declaration at 2; Dr. Rahangdale's Declaration at  4.  Plaintiff concedes that Defendant Le had no ability himself either to conduct a liver biopsy or to provide ribavirin/interferon treatment.  Plaintiff's Deposition at 36-37 ("There was nothing else [Dr. Le] could do."); Dr. Le's Declaration at 2 (stating that a liver biopsy is a medical procedure that is outside of his area of expertise.).

In his October 8, 2012 deposition, Defendant Le testified in part:  "My duties are to provide good health care to all inmate[s] who come" to BCI (Le's Deposition at 11); "I am just a primary care doctor. I refer to specialist Dr. Radi. He's a gastroenterologist, and he want[s] to do a liver biopsy.  So I request with my boss

for the liver biopsy." (Id. at 27); "After [the liver biopsy] was denied, I continued to see Mr. George. I continued to order the test to monitor his problem. And I had [a] request for reconsideration. I request with Donna Graham." (Id. at 31); "I care about [George]. I want him to be treated." (Id. at 32); "In DOC, we are not discussing about the cost of the treatment. We care about the patient. We [do] not care about the cost." (Id. at 60-61); "After I got [the] recommendation from Dr. Radi, Dr. Radi saw the patient on January 12th, 2010. I request[ed] [a] liver biopsy on January 14th, 2010. I did everything right away." (Id. at 74).

### 3. Defendant Dr. Le Has Met His Initial Burden of Showing No Genuine Issue Regarding Deliberate Indifference

The undersigned recommends that Defendant Le has met his initial burden of showing, by reference to numerous sworn declarations, George's medical records, and Dr. Rahangdale's Expert Report describing Hepatitis C and the corresponding acceptable treatment, that there are no genuine issues of material fact that need be decided at trial regarding his alleged deliberate indifference.

In a case similar in many respects to the action before this Court, the Eleventh Circuit affirmed the district court's granting of summary judgment in defendant's favor where the plaintiff complained that the defendant, a nurse, should have treated his Hepatitis C with the medication interferon. Faheem v. Armor Correctional Health, 502 F. App'x 920 (11th Cir. 2012) (per curiam). The Eleventh Circuit stated:

> The district court did not err when it entered summary judgment against Faheem's complaint. Nurse

Gaminara treated Faheem, who had a history of Hepatitis C, but "slightly" elevated liver enzymes, by ordering blood work to assess his liver and high cholesterol, regulating his diet and later prescribing Lopid to control his cholesterol, and ordering blood tests to monitor his liver. Faheem argues that Gaminara obtained his medical records to avoid sending him to a specialist, but Faheem fails to explain how his condition required the attention of a specialist. The affidavit of Dr. Chad Zawitz, a physician and medical expert, established that Gaminara adhered to the standard of care in her treatment of Faheem, including prescribing him Lopid. Faheem speculates that he had advanced liver disease and Lopid caused him increased knee pain and skin disorders, but test results and Dr. Zawitz's affidavit established that Faheem exhibited none of the ailments ordinarily associated with advanced liver disease and the disease could not have been caused by administering Lopid to him. Faheem complained that Gaminara should have treated his Hepatitis C with the medication Interferon, *but Dr. Zawitz averred that Interferon was contraindicated for inmates like Faheem who would not be detained long enough to complete the treatment.* Even if we were to conclude that Gaminara was negligent in treating Faheem, negligence is not sufficient to establish deliberate indifference. See Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Id. at 922 (emphasis added).

In another similar case, a plaintiff, suffering from Hepatitis C, asserted that he was not given interferon and ribavirin, despite his repeated requests for those drugs. Loeber, 487 F. App'x 548. In dismissing the complaint, the district court concluded that plaintiff had failed to alleged sufficient facts to show a violation of the Eighth Amendment. The Eleventh Circuit affirmed the district court's granting of the defendants' motion to dismiss and stated:

The issue posed by this appeal is whether the complaint, viewed in the light most favorable to Plaintiff, alleges sufficient facts to show an objectively insufficient response to that need. Plaintiff asserts his requested treatment —interferon and ribavirin— was required to treat his underlying condition and was the treatment prescribed earlier for him by a doctor.

The Defendants did not ignore Plaintiff's Hepatitis C condition; instead, they chose an alternative treatment —lactulose — to address elevated blood ammonia levels which are a common complication of Hepatitis C. Cf. Brown, 387 F.3d at 1351 (complete failure to treat Hepatitis C condition amounted to deliberate indifference). Plaintiff assumes that interferon and ribavirin represented a superior treatment. But interferon and ribavirin have potentially serious side effects; prescription of those drugs is highly individualized to the patient and depends on many factors. See Bender v. Regier, 385 F.3d 1133, 1135 (8th Cir. 2004). Perhaps —we do not say—treatment by lactulose instead of the treatment preferred by Plaintiff constituted negligence, but negligence fails to state a cognizable deliberate indifference claim. Plaintiff's disagreement with the course of treatment employed fails to support an inference that Defendants acted with disregard for the harm posed to Plaintiff by Hepatitis C.

We conclude, as did the district court, that the allegations in Plaintiff's complaint are "merely consistent" with liability; the allegations "stop[ ] short of the line between possibility and plausibility of 'entitlement to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007).

Id. at 549. Thus, in analogous circumstances, the Eleventh Circuit has recognized

that there is no constitutional requirement that a prisoner be treated with the

ribavirin/interferon drug combination. As in Loeber, Dr. Le did not ignore Plaintiff's

need for medical care, but treated him by ordering appropriate tests and referring him to a specialist.  See Nimmons v. Aviles, 409 F. App'x 295, 298  (11th Cir. 2011) (per curiam) (affirming the district court's granting of summary judgment in defendant's favor where the record did not support deliberate indifference because the defendant "acted reasonably" in treating plaintiff and plaintiff failed to produce evidence that the defendant had "disregarded the risk of harm" that his injured knee posed to him).

Plaintiff contends that the diagnostic workup took too long.  See Complaint at 4-7.  However, even assuming some validity to this argument, "[w]hile a delay in treatment may constitute deliberate indifference to a prisoner's serious medical needs, some delay may be tolerable, depending on the nature of the need and the reason for the delay."  Thomas v. Poveda, No. 12-11448, 2013 WL 1760587, *5 (11th Cir. Apr. 24, 2013) (citation omitted).  On the record before this Court, there is no indication that Dr. Le "deliberately delayed" the pre-diagnostic testing or "acted with callous disregard" for George's medical condition.  Id.  There is no evidence to support a conclusion that the any delay was due to more than mere negligence, if that, that the treatment was needed on an emergency basis, or that any delay worsened George's condition.  See Whitehead, 403 F. App'x at 403 ("When a plaintiff alleges that delay in medical treatment shows deliberate indifference, he 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'") (citation omitted).  Of note,

Plaintiff's Hepatitis C had gone untreated for over ten years prior to his entering the custody of the FDOC. Accordingly, the undersigned recommends that Defendant Le has met his initial burden of showing that there are no genuine issues of material fact to be decided at trial regarding his alleged deliberate indifference.

**4.    Defendant Dr. Solorzano Has Met His Initial Burden of Showing No Genuine Issue Regarding Deliberate Indifference**

Defendant Solorzano has also met his initial burden of showing that he was not deliberately indifferent to Plaintiff's serious medical needs. Dr. Solorzano's decision not to approve the liver biopsy had a sound medical basis, rooted in a demonstrated risk of substantial harm arising from the use of the two-drug regimen (ribavirin/interferon). The Hepatitis C treatment simply could not be safely administered in less than eighteen months. Thus, due to "[i]nsufficient time to treat safely prior to [Plaintiff's] planned EOS[,]" <u>see</u> P. Ex. 3, Dr. Solorzano promptly notified Dr. Le on January 19, 2010, of the denial of the request for a liver biopsy.

As previously set forth, to demonstrate deliberate indifference on the part of a defendant, a plaintiff must show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." <u>Goodman</u>, 718 F.3d at 1332 (citation omitted). Regarding Dr. Solorzano, he did not disregard a risk to Plaintiff at all, much less with conduct that is more than gross negligence. His timely letter to Dr. Le as well as his deposition demonstrate that he gave the request "careful consideration" and based his decision on his clinical

judgment. <u>See</u> P. Ex. 3; Solorzano's Deposition at 24. Accordingly, the undersigned recommends that Dr. Solorzano has met his initial burden of showing that there are no genuine issues of material fact to be decided at trial regarding his alleged deliberate indifference.

### 5. Defendant Dr. Ogunsanwo Has Met His Initial Burden of Showing No Genuine Issue Regarding Deliberate Indifference

Plaintiff also asserts that Defendant Ogunsanwo participated in the decision to deny him a biopsy or further treatment for Hepatitis C. Plaintiff believes, but does not know for sure, that Dr. Le contacted Dr. Ogunsanwo in his further efforts to obtain approval of a biopsy. Plaintiff's Deposition at 49-50. However, Dr. Ogunsanwo played no part in the decision. <u>See</u> Dr. Ogunsanwo's Declaration. He was Medical Executive Director for FDOC Region III from May 19, 2006, to April 18, 2010. <u>Id</u>. Since BCI was located in Region II, and therefore outside Dr. Ogunsanwo's area of responsibility, Dr. Ogunsanwo denies any involvement with Plaintiff's medical care, stating:

> [Baker Correctional Institution] was outside my area of responsibility. That is, I was not involved in treatment decisions involving inmates in Region II institutions, nor was I usually consulted about such treatment decisions. No one contacted me about any treatment decisions affecting Robert George, the plaintiff in this lawsuit, nor was I involved in responding to any medical care grievances Mr. George may have submitted.

> I have no personal knowledge about Mr. George. It is my understanding that he was at Baker CI for most of his incarceration.

Dr. Ogunsanwo's Declaration. In a conclusory fashion with no factual support, Plaintiff asserts that Dr. Ogunsanwo "had knowledge of Plaintiff's serious medical needs" and "participated in the denial of medical treatment." Plaintiff's Response at 12, 13. To the extent that Plaintiff attempts to hold Dr. Ogunsanwo, as the Assistant Secretary of Health Services at the FDOC, liable based on his implementation, enforcement, and annual reviews (May 19, 2010, February 9, 2011, and April 3, 2012) of HSB 15.03.09, see P. Ex. 5 at 16-17, such a claim fails since such actions on the part of Dr. Ogunsanwo occurred after the relevant time period. Dr. Solorzano had already denied the January 2010 request for a liver biopsy based on HSB 15.03.09, and any requests for reconsideration were denied without Dr. Ogunsanwo's involvement. See Le's Deposition; Dr. Ogunsanwo's Declaration. Given the undisputed fact that Dr. Ogunsanwo was not involved in any delay or denial of medical care for Plaintiff, the undersigned recommends that Defendants' Motion for Summary Judgment as to Defendant Ogunsanwo be granted and summary judgment be entered in his favor.

### 6. Plaintiff Has Failed to Show a Genuine Issue for Trial Regarding Deliberate Indifference

With these Defendants having discharged their initial burden of showing that there are no genuine issues of material fact regarding deliberate indifference,

Plaintiff must go beyond the pleadings, and with his own affidavits or declarations (or by depositions, answers to interrogatories, and admissions on file), designate specific facts showing that there is a genuine issue of material fact for trial.

As previously enumerated, in response to the summary judgment motion, Plaintiff submitted the depositions of Drs. Le, Solorzano, and Harris; Dr. Radi's Consultant's Report; Dr. Solorzano's letter denying the request for a liver biopsy; Dr. Nitzkin's Expert Report; and his own affidavit.

In Plaintiff's Affidavit, he avers, in pertinent part:

> At no time do I recall anyone from the Florida Department of Corrections ("DOC") or its medical staff asking me if I would need counseling for any sexual partners should I receive treatment for Hepatitis C or that such counseling would be required. Had they asked that information, I would have informed them that such counseling was unnecessary as I did not plan on having a sexual partner upon my release.

> At no time during my incarceration with the DOC did I receive treatment for Hepatitis C.

Plaintiff's Affidavit, paragraph 3. Dr. Le, in his deposition, testified that FDOC medical personnel do not inquire about the patient's sex life and do not discuss with the inmate whether or not he anticipates engaging in sexual activity that could lead to pregnancy. Le's Deposition at 53-54. The issue was also posed to Dr. Solorzano at deposition. The following colloquy ensued.

> [Plaintiff's Counsel]: And would it be necessary to determine for that six month observation period whether or not the inmate was sexually active or not?

[Dr. Solorzano]: No.

[Plaintiff's Counsel]: And why is that?

[Dr. Solorzano]: We make the recommendations for contraception and we have to be able to monitor that within those six months.

Solorzano's Deposition at 25-26.

Plaintiff also provides the expert report of Dr. Nitzkin, M.D., M.P.H., D.P.A. (a public health physician, board certified in preventive medicine, with a Master's Degree in public health and a doctorate degree of public administration), who conclusorily agrees with Plaintiff's allegations. However, Dr. Nitzkin's Expert Report was submitted without attestation, and thus has "no probative value" to oppose the summary judgment motion. Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003). The Eleventh Circuit explained:

> Unsworn statements "do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e)" and cannot be considered by a district court in ruling on a summary judgment motion. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608–09 n. 17, 26 L.Ed.2d 142 (1970). Because the preliminary report was submitted without attestation, it had no probative value and properly was not considered by the district judge in ruling on the officers' summary judgment motions.

Id.; West v. Higgins, 346 F. App'x 423, 425-26 (11th Cir. 2009) (per curiam) (stating unsworn statements "should not be 'consider[ed] in determining the propriety of summary judgment'") (citation omitted).

Moreover, even if Dr. Nitzkin's report was sworn to, the report contains other significant deficiencies for summary judgment purposes. For example, Dr. Nitzkin sets forth the following legal conclusion:

> Both the six month delay in completing the needed pre-treatment diagnostic workup and refusal to provide the needed anti-Hepatitis therapy based on the 18 month guideline, by the Baker Correctional Institution of the Florida Department of Corrections, constitute deliberate indifference to a serious medical need.

Dr. Nitzkin's Expert Report at 3. Dr. Nitzkin's purely legal conclusion that the actions of "Baker Correctional Institution of the Florida Department of Corrections" constitute deliberate indifference to a serious medical need is not enough to overcome summary judgment. See West, 346 F. App'x at 425 ("Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion.") (citation omitted); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. . . . The evidence presented cannot consist of conclusory allegations or legal conclusions.") (citation omitted).

Moreover, Dr. Nitzkin's report is in part speculative. For example, he speculates that the eighteen month policy guideline "seems intended to reduce costs

to the prison system for short-term inmates, without considering the needs of the inmate, the risk to the outside community, or the possibility by which prison health authorities could prearrange, completion of the course of treatment and the desired post-treatment follow-up through public health authorities and external medical providers."  Dr. Nitzkin's Expert Report at 2-3.  There is, however, no evidence before the Court to support this conjecture.  "Speculation and conjecture cannot create a genuine issue of material fact."  Chavez v. URS Fed. Techical Services, Inc., 504 F. App'x 819, 820 (11th Cir. 2013)  (citing Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)); Whitehead, 403 F. App'x at 402-03 (citation omitted).

In addition, Dr. Nitzkin states that, in November 2009, nineteen months still remained on Plaintiff's anticipated period of incarceration.  See Dr. Nitzkin's Expert Report at 2.  However, at that time, George was still undergoing pre-diagnostic testing and evaluation under the care of both Drs. Le and Radi.  Dr. Solorzano did not deny the liver biopsy until January 19, 2010, when there was only sixteen months left on Plaintiff's anticipated period of incarceration.  See Haynes' Affidavit at 2.  Thus, this denial was within the subject eighteen-month guideline.

At best, Dr. Nitzkin's report establishes a difference in medical opinion between him and Drs. Le and Solorzano or perhaps medical negligence.  It does not, however, create a genuine issue of material fact regarding deliberate indifference.

Whitehead, 403 F. App'x at 404 (stating that plaintiff "has established, at best, a difference of medical opinion as to the appropriate treatment" for his injury).

As previously discussed, Plaintiff, as the non-moving party, must set forth specific facts showing a genuine issue for trial. There must be enough of a showing that the jury could reasonably find in Plaintiff's favor. Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Plaintiff's exhibits, including Dr. Nitzkin's Expert Report, do not satisfy this burden. Therefore, the undersigned recommends that there is no genuine issue of material fact regarding Plaintiff's claims of deliberate indifference.

### B. Claims Against Dr. Le, McNeil, Flores, Robinson and Kemp Based on Denial of Grievances

Plaintiff also asserts that Defendant Le acted wrongfully by signing responses to Plaintiff's medical grievances, stating that Plaintiff was being treated for Hepatitis C when he allegedly was not being provided treatment. Complaint at 6-7; Plaintiff's Deposition at 38. Additionally, Plaintiff asserts that Defendants McNeil, Flores, Robinson, and Kemp violated his Eighth Amendment rights based on their alleged involvement in also denying his medical grievances. Specifically, Plaintiff asserts that Defendant McNeil is responsible for denying him medical treatment because he was the FDOC Secretary and authorized Defendant Kemp to respond to Plaintiff's grievances on his behalf. Complaint at 6-7; Plaintiff's Deposition at 40. Plaintiff

states that Defendant Flores, as the Warden of BCI at the time he was incarcerated there, signed off on a grievance saying he was being treated and also shifted responsibility for responding to his grievances onto Defendant Robinson. Complaint at 7; Plaintiff's Deposition at 50, 56-57. As to Defendant Robinson, an Assistant Warden at BCI, Plaintiff states that, on February 23rd and March 2, 2010, Plaintiff filed requests for medical care, but Robinson denied the requests. Complaint at 6-7; Plaintiff's Deposition at 52-53. As to Defendant Kemp, an employee in the FDOC's central office, Plaintiff states that she denied his medical grievances. Complaint at 7; Plaintiff's Deposition at 40-44.

Plaintiff's assertions are insufficient to impose liability under § 1983, given that the record reflects that medical personnel did not exhibit deliberate indifference to Plaintiff's serious medical needs. Defendants McNeil and Flores delegated the processing of inmate grievances, and Defendants Robinson and Kemp reasonably relied upon the medical professionals to investigate and draft appropriate and timely responses to medical grievances. See Declarations of McNeil, Flores, Robinson and Kemp. Plaintiff has not shown deliberate indifference on the part of these Defendants. Specifically, Plaintiff has not established that these Defendants disregarded a risk of serious harm to him by conduct that is more than gross negligence. Goodman, 718 F.3d at 1332.

Moreover, even assuming these Defendants either denied Plaintiff's medical grievances or directed that those grievances be denied, those actions alone are

insufficient to establish personal participation in the alleged constitutional violations. See Larson v. Meek, 240 F. App'x 777, 780 (10th Cir. 2007) ("Nothing in either the original complaint or the amended complaint indicates any action or omission by [defendant] beyond his denial of [Plaintiff]'s grievances. [Defendant]'s denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations") (citation omitted); Baker v. Rexroad, 159 F. App'x 61, 62 (11th Cir. 2005) (per curiam) ("Because the failure of [the defendants] to take corrective action upon the filing of [the plaintiff]'s administrative appeal at the institutional level did not amount to a violation of due process, the district court properly determined that [the plaintiff] failed to state a claim under § 1983"); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (finding that prison officials who were not involved in an inmate's termination from his commissary job, and whose only roles involved the denial of administrative grievances or the failure to act, were not liable under § 1983 on a theory that the failure to act constituted an acquiescence in the unconstitutional conduct). Thus, the undersigned recommends that Defendants' Motion for Summary Judgment on these claims as to Defendants Dr. Le, McNeil, Flores, Robinson and Kemp be granted.

### C. Claims Against Dr. Ogunsanwo, McNeil, Flores and Robinson Based on Supervisory Liability

Plaintiff asserts that Defendants McNeil, Flores, Robinson and Ogunsanwo, as supervisors, were responsible for the denial of medical care. In the context of

supervisory liability against the Defendants, the United States Court of Appeals for

the Eleventh Circuit has stated:

> "Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks and citation omitted).[22]  "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).
>
> "The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted).[23]  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown, 906 F.2d at 671.  A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez, 325 F.3d at 1235, or that a supervisor's "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991).

---

[22] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

[23] Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008), overruled in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010). Further, the Eleventh Circuit stated:

> In a § 1983 suit, liability must be based on something more than respondeat superior. Brown,[24] 906 F.2d at 671. Supervisory liability can be found when the supervisor personally participates in the alleged constitutional violation, or when there is a causal connection between the supervisory actions and the alleged deprivation. Id. A causal connection can be established through a showing of a widespread history of the violation. Id. at 672.

Reid v. Sec'y, Fla. Dep't of Corr., 486 F. App'x 848, 852 (11th Cir. 2012). Thus, any supervisory claims against Defendants McNeil, Flores, Robinson and Ogunsanwo fail because Plaintiff has not shown that these Defendants personally participated in the alleged constitutional violations. Further, the record discloses no facts suggesting any causal connection between the Defendants' actions and the alleged constitutional deprivations. Finally, given that there were no federal constitutional violations, there is no supervisory liability. Therefore, the undersigned recommends that summary judgment on these claims be entered in favor of Defendants McNeil, Flores, Robinson and Ogunsanwo.

---

[24] Brown v. Crawford, 906 F.2d 667 (11th Cir. 1990).

## D.    Defendants Are Entitled to Qualified Immunity

Defendants Le, Solorzano, McNeil, Flores, Robinson and Kemp claim that

they are entitled to qualified immunity.[25] Defendants' Motion for Summary Judgment

at 19-21, 24.  The undersigned agrees.

The Eleventh Circuit has stated:

> "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quoting Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (internal quotations omitted)).  To claim qualified immunity, a defendant must first show he was performing a discretionary function.  Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005) (citation omitted).  The burden then shifts to the plaintiff to show that: (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the violation.  Id. at 1156.

Barnes v. Zaccari, 669 F.3d 1295, 1303 (11th Cir. 2012).

Here, it appears to be undisputed that Defendants were performing

discretionary functions as FDOC employees at all material times.  Thus, to defeat

qualified immunity on a motion for summary judgment, Plaintiff must show that

Defendants violated a constitutional right and that such right was clearly established

---

[25] It appears that Dr. Ogunsanwo did not raise this defense because of his complete lack of involvement with Plaintiff's care.

at the time of the alleged violation.  The Eleventh Circuit recently explained Plaintiff's burden.

> To determine whether a plaintiff has met her burden, a court must both "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 816 (2009).  A court may undertake these two inquiries in either order.  Id. at 236, 129 S.Ct. at 818. Accordingly, we are afforded the flexibility to determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all.  See, e.g., Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009).

Maddox v. Stephens, No. 12-15237, 2013 WL 4437161, *8 (11th Cir. Aug. 21, 2013).

Thus, in assessing Defendants' claim of qualified immunity, the Court may "proceed directly to the question of whether the applicable law was already clearly established when the incident took place."  Youmans, 626 F.3d at 562.  In Maddox, the Eleventh Circuit stated:

> A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Lewis, 561 F.3d at 1291-92 (internal citations omitted).[26]

---

[26] Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288 (11th Cir. 2009).

. . . .

> This third category, however, is "narrow" and "encompasses those situations where 'the official's conduct lies so obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" Loftus, 690 F.3d at 1205 (quoting Terrell v. Smith, 668 F.3d 1244, 1257 (11th Cir. 2012)).

> "The inquiry whether a federal right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Id. at 1204 (quoting Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011 (en banc)). "The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [state official] that [her] conduct was unlawful in the situation [she] confronted." Id. (quoting Vinyard, 311 F.3d at 1350[27]).

Maddox, 2013 WL 4437161, *8-9 .

Plaintiff asserts that the "denial of treatment of Hepatitis C is a violation of a clearly established constitutional right." Plaintiff's Response at 11. In support of his argument, he cites two cases: Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam), and Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). In Erickson, the plaintiff filed a complaint against prison officials, asserting that his liver condition resulting from Hepatitis C required a treatment program that officials had commenced, but then wrongfully terminated, with life-threatening consequences. Deeming plaintiff's allegations to be conclusory, the court of appeals affirmed the

---

[27] Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002).

district court's dismissal of plaintiff's complaint. Thus, the United States Supreme Court addressed the sufficiency of a pleading under Rule 8(a) of the Federal Rules of Civil Procedure, specifically, a complaint filed pro se. The Court reversed the Tenth Circuit's dismissal of the prisoner's Eighth Amendment claim, holding that the court of appeals had "depart[ed] from the liberal pleading standards" of Rule 8(a). Erickson, 551 U.S. at 94. The Court reiterated that "[s]pecific facts are not necessary," and that the complainant "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Id. at 93 (citation omitted) (internal quotation marks omitted)). The Court also emphasized that the court of appeals' departure from Rule 8(a)'s liberal pleading standard was particularly unwarranted because the complainant was pro se. Id. at 94. Thus, in vacating the judgment of the court of appeals and remanding the case for further proceedings, the Court concluded:

> Whether petitioner's complaint is sufficient in all respects is a matter yet to be determined, for respondents raised multiple arguments in their motion to dismiss. In particular, the *proper application of the controlling legal principles to the facts is yet to be determined*. The case cannot, however, be dismissed on the ground that petitioner's allegations of harm were too conclusory to put these matters in issue.

Id. (emphasis added).

In Brown, 387 F.3d 1344, the plaintiff filed a pro se complaint, asserting deliberate indifference to his serious medical needs (Hepatitis C and human

immunodeficiency virus) in violation of the Eighth Amendment, as a result of the withdrawal of prescribed medications. The district court denied Brown's motion to amend his complaint and sua sponte dismissed his complaint. On appeal, the Eleventh Circuit concluded:

> Taking the allegations in the complaint as true, the continuing disregard of Brown's HIV and hepatitis constitutes deliberate indifference. We do not, therefore, find an alternate basis on which to affirm the dismissal of Brown's complaint.

Id. at 1351-52. Thus, the Eleventh Circuit reversed the decision of the district court and remanded the action for further proceedings, stating:

> [T]he district court abused its discretion in denying Brown the right to amend his complaint, under Federal Rule of Civil Procedure 15(a), and the amended complaint alleged imminent danger of serious physical injury, under 28 U.S.C. section 1915(g), and a valid claim of deliberate indifference to serious medical needs, under the Eighth and Fourteenth Amendments . . . .

Id. at 1352.

After review and consideration of the case law, including Erickson and Brown, the undersigned recommends that Plaintiff has not met his burden of showing that the alleged constitutional right at issue was clearly established at the time of each Defendant's alleged misconduct. First, Plaintiff has not shown case law with indistinguishable facts clearly establishing the constitutional right. Both Erickson and Brown are distinguishable. Both of these cases were determined at the pleading stage, and so neither case provides any factual development. Specifically, neither

case establishes any time parameters within which testing and/or treatment for Hepatitis C must commence, or mandates any certain treatment for that disease. These cases do not provide a reasonable official in the position of any of the Defendants with fair notice that his conduct was unconstitutional.

Moreover, as previously discussed in conjunction with the analysis of the deliberate indifference standard, the Eleventh Circuit, in similar factual circumstances involving treatment of Hepatitis C (Faheem, 502 F. App'x 920; Loeber, 487 F. App'x 548), concluded that there were no federal constitutional violations (neither Eighth nor Fourteenth Amendments) on the part of those defendants. Although Faheem and Loeber were decided in 2012, and thus after the relevant time period for assessing deliberate indifference in George's case, these cases further show that there was no clearly established federal constitutional law on point.

Nor has Plaintiff shown "a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right . . . ." Maddox, No. 12-15237, at *21. And, finally, Plaintiff has not shown "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Id. at 21. Thus, the undersigned recommends that these Defendants are entitled to qualified immunity, as their conduct violates no clearly established federal constitutional rights of which a reasonable person would have known.

## E.    Plaintiff's Injunctive Relief Claim is Moot

In the Complaint, Plaintiff seeks injunctive relief from the Defendants in their official capacities.  See Complaint at 10.  However, as of March 17, 2011, Plaintiff was released from FDOC custody.  Thus, Plaintiff's request for equitable relief is moot.

An inmate's release from prison will moot that prisoner's claims for injunctive and declaratory relief. See Zatler, 802 F.2d at 399.  The rationale underlying this rule is that injunctive relief is "a prospective remedy, intended to prevent future injuries," Adler v. Duval Cnty. Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997), and, as a result, once the prisoner has been released or transferred, the court lacks the ability to grant injunctive relief and correct the conditions of which the prisoner complained.  See Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir. 1985) (per curiam) (stating that a prisoner's past exposure to sub-par conditions in a prison "does not constitute a present case or controversy involving injunctive relief if unaccompanied by any continuing, present adverse effects").  "The general rule in our circuit is that a transfer or release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief."  Smith v. Allen, 502 F.3d 1255, 1267 (11th Cir. 2007) (citations and footnote omitted).  Thus, Plaintiff's claim for injunctive relief relating to his medical treatment for Hepatitis C at the prison fails to present a case or controversy since he is no longer incarcerated by the FDOC.  Therefore, even assuming

Defendants had any potential liability for damages, they would still be entitled to summary judgment in their official capacities.

## RECOMMENDATION

Accordingly, it is respectfully **RECOMMENDED** that:

1.      Defendants' Motion for Summary Judgment  (Doc. 108) be **GRANTED** and summary judgment be entered in favor of the following Defendants:  Walter A. McNeil; Celeste Kemp; Melody Flores; Susan Robinson; Dr. Trung Van Le, M.D.; Dr. Ronald Solorzano, M.D.; and Dr. Olugbenga Ogunsanwo, M.D.[28]

2.      Judgment to that effect be withheld pending adjudication of the action as a whole.  See Fed. R. Civ. P. 54(b).[29]

**DONE AND ENTERED** at Jacksonville, Florida, on August 23rd, 2013.


_Joel B. Toomey_
JOEL B. TOOMEY
United States Magistrate Judge

---

[28] Given this recommendation, the undersigned has not addressed Defendants' arguments pertaining to causation and damages.  Moreover, Plaintiff has requested nominal damages.

[29] The only remaining Defendant is John Doe, a Utilization Management Authorization employee, who allegedly participated in the denial of the request for a liver biopsy on Plaintiff's behalf.  However, Plaintiff, who is represented by counsel, has never identified and served this Defendant.

sc 8/23
Copies to:
The Honorable Marcia M. Howard, United States District Judge
Counsel of Record